[Cite as *Janis v. Janis*, 2011-Ohio-3731.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

PATRICK JANIS                                    :

    Plaintiff-Appellant                     :        C.A. CASE NO.    23898

v.                                               :        T.C. NO.    05DR1174

DEBORAH JANIS                                    :        (Civil appeal from Common
                                                          Pleas Court, Domestic Relations)
    Defendant-Appellee                      :

                                                 :

      . . . . . . . . . .

# O P I N I O N

Rendered on the _____29th_____ day of _____July_____, 2011.

. . . . . . . . . .

JOSE M. LOPEZ, Atty. Reg. No. 0019580, 18 East Water Street, Troy, Ohio 45373
    Attorney for Plaintiff-Appellant

CHRISTOPHER R. CONARD, Atty. Reg. No. 0039751 and SASHA ALEXA M. VanDeGRIFT, Atty. Reg. No. 0080800, 33 W. First Street, Suite 600, Dayton, Ohio 45402
    Attorneys for Defendant-Appellee

. . . . . . . . . .

FROELICH, J.

{¶ 1} Patrick Janis appeals from a Final Judgment and Decree of Divorce entered by the Montgomery County Court of Common Pleas, Domestic Relations Division. He challenges the trial court's distribution of marital assets and debts, including its determination of separate and marital assets, and its award of attorney fees to Deborah Janis. For the

following reasons, the judgment of the trial court will be affirmed in part, modified in part, reversed in part, and remanded for further proceedings.

I

{¶ 2} The parties were married in 1986. Mrs. Janis received a substantial inheritance from a neighbor, Joseph Updyke, in 1998. Mr. Janis filed for divorce in September 2005, and the parties agreed to use September 30, 2005, as the de facto date of the end of the marriage for the purpose of valuing assets. Mrs. Janis had one child before the marriage, and one child was born during the marriage, both of whom were emancipated by the time of the divorce. The contentious divorce proceedings extended over several years and two multi-day hearings.

{¶ 3} During the divorce proceedings, much of the dispute over the division of assets centered on the extent to which Mrs. Janis's inheritance was traceable separate property that should be returned to Mrs. Janis. The distribution of assets was also complicated by the fact that, on the advice of an accountant, the Janises placed many of their assets into a "fortress plan," whereby they formed a C-corporation and two limited partnerships to hold and manage their assets.

{¶ 4} During the divorce proceedings, the trial court repeatedly expressed its frustration and displeasure with the perceived delay and gamesmanship in which Mr. Janis and one of his attorneys engaged prior to and during the first hearing. (Mr. Janis is an attorney himself.) Mr. Janis was represented by a different attorney at the second hearing.

{¶ 5} The Final Judgment and Decree of Divorce was entered on February 19, 2010. The trial court's resolution of the disputed issues can be summarized as follows. The trial

court awarded several hundred thousand dollars to Mrs. Janis as her separate property traceable to her premarital assets and her inheritance, and it divided the assets that it found to be marital assets fairly equally. Additionally, the trial court awarded Mrs. Janis $38,000 in attorney fees; this award was motivated, at least in part, by the court's frustration with Mr. Janis's and one of his attorneys' conduct.

II

{¶ 6} A brief description of the parties' assets, including the trial court's disposition of each asset, will be helpful to our discussion of the assignments of error.

The Marital Residences

{¶ 7} With respect to their marital residences, both parties testified to the following facts. Mrs. Janis bought the house at 321 Hadley Road in Oakwood in the early 1980s. The parties married in 1986, at which time the Hadley property was appraised at $73,000. Numerous improvements were completed during the marriage, including the replacement of the furnace and duct work, professional landscaping, upgraded electric, the addition of air conditioning and an attic fan, and repainting and refinishing the floors of two bedrooms.

{¶ 8} The house was sold in 1989 for $100,000, and the parties purchased a house at 19 Ivanhoe Avenue, also in Oakwood, which was jointly titled. In order to effectuate this purchase, Mrs. Janis took out a $39,000 "swing loan" on the Hadley property. When the Hadley property sold, the Hadley mortgage and the swing loan were paid off, and the $39,000 appears to have become part of the money contributed toward the purchase of the Ivanhoe property. In addition to paying off the swing loan and mortgage, the parties cleared approximately $4,500, which was placed in a joint account. The parties lived in the home on

Ivanhoe until their separation.

{¶ 9} The parties disagreed as to whether the $39,000 swing loan was separate property for which Mrs. Janis should be repaid upon the sale of the Ivanhoe house. They also disagreed over the extent to which the appreciation on the Hadley property had been attributable to the parties' work on the home, which would make it marital property, or to passive appreciation of the property, which would be treated as separate property (because the house was Mrs. Janis's separate property when the parties married).

{¶ 10} The trial court ordered the parties to sell their house on Ivanhoe. From the anticipated proceeds of that sale, it awarded each party an amount equal to half of the appreciation of the Hadley property between the date of their marriage and the date of sale of that property ($100,000 - $73,000 = $27,000; $27,000/2 = $13,500 each). Additionally, the court awarded Mrs. Janis $39,000 "as reimbursement for her contribution to the swing loan" and ordered the return of all other funds used from the sale of Hadley to purchase Ivanhoe.[1] In a separate section of the judgment dealing with the disposition of the Ivanhoe property, the trial court stated that, after paying the costs associated with the sale of Ivanhoe, Mrs. Janis "shall be reimbursed for the contribution she made from her pre-marital home ($39,000.00 swing loan) and her one-half of the increase in value of the Hadley real estate ($13,500.00) for a total of $52,500.00, Thereafter, the net sale proceeds shall be divided equally between the parties."

Pennywise

{¶ 11} Pennywise was a C-corporation established as part of a "fortress plan," which

---

[1]There is no evidence in this record that other funds from the sale of Hadley were used to purchase Ivanhoe.

the Janises set up in 1998 to handle investments. Mr. Janis also referred to it as a "shell corporation." The fortress plan was established on the advice on an accountant, Douglas Talmage, for tax and estate planning purposes. Pennywise was the general partner in two limited partnerships, the Cavalier Manor Limited Partnership and the Manna Limited Partnership, which will be discussed below. The shares of the Pennywise corporation were held by Mr. and Mrs. Janis (33% each); their two sons (16½% each); and the Dayton Foundation (one percent).

{¶ 12} The trial court awarded Pennywise to Mr. Janis, but it ordered him to reimburse Mrs. Janis for half of the $5,106.44 that was in the corporate account at the end of the marriage and to pay to Mrs. Janis half the $4,000 in loans he had taken from Pennywise for the alleged payment of property taxes after the de facto end of the marriage.

Cavalier Manor

{¶ 13} Cavalier Manor is a limited partnership that the Janises formed in 1998 to own and acquire real estate. Mr. and Mrs. Janis each held a 49.5% interest in Cavalier Manor, and Pennywise held a one percent interest. Cavalier Manor's primary asset was a four-unit apartment building located at 440 Lonsdale Avenue in Oakwood.

{¶ 14} When the Lonsdale apartment building was purchased, the Janises could not get a mortgage in the partnership's name, so Mr. Janis obtained financing and the building was titled in his name. According to Mr. Janis, the building was purchased, in part, with $85,111 that Mrs. Janis "gifted" to him from her inheritance, as evidenced by a gift letter (Ex. I-8) that was required by the bank, and with $15,000 from marital funds. He testified that substantial additional funds were contributed over time from marital assets. The apartment

building on Lonsdale was appraised at $265,000 while the divorce was pending; the amount of outstanding debt on the property was unclear.

{¶ 15} Mrs. Janis lived with one of her sons in one of the Lonsdale apartment units, rent free, during the divorce proceedings, in lieu of receiving temporary spousal support. Mr. Janis continued to manage and maintain the property while the divorce was pending. He claimed that he and Pennywise made loans to Cavalier Manor during this period to cover property taxes.

{¶ 16} After the parties separated, a prospective tenant with a physical impairment filed a complaint against Cavalier Manor with the Ohio Civil Rights Commission, alleging that Mr. Janis had refused to make requested modifications to one of the apartment units to accommodate the impairment. This claim had been settled by the time of the final judgment and decree of divorce, but Mrs. Janis sought reimbursement from Mr. Janis for her attorney fees with respect to that claim.

{¶ 17} The court refused to treat the $85,111 contributed by Mrs. Janis to the purchase of the Lonsdale property as her separate property, treating it instead as a gift. The court ordered that the apartment building be sold and the proceeds divided equally between the parties. After doing so, Mr. Janis was ordered to dissolve the partnership and provide a full and final accounting. The court refused to award any attorney fees to Mrs. Janis that were incurred in relation to the OCRC claim, and it refused to reimburse Mr. Janis for the loans he claimed to have made to Cavalier Manor.

{¶ 18} Manna

{¶ 19} Manna is a limited partnership established by the Janises in 1998 to manage

investments. As with Cavalier Manor, the Janises initially owned 49.5% each and Pennywise owned one percent. The Janises subsequently made gifts to their sons of small interests in Manna, and one of the sons purchased an additional interest with an investment of $22,500. At the time of the divorce, Mr. Janis and Mrs. Janis owned 45.3% each, the sons owned small percentages, and Pennywise owned one percent.

{¶ 20} At the time of the divorce, Manna had accounts with Salomon Smith Barney, Intrust, Key Investments, and other funds. Mrs. Janis presented testimony and documentary evidence tracing a large portion of the funds in the Manna accounts to accounts that she had originally opened in her name only and into which she had deposited money from the sale of Updyke's farm, house, and other assets. She asked the court to divide the Manna accounts in proportion to the parties' respective investments, rather than their ownership interests, to reflect that a substantial portion came from her separate property.

{¶ 21} Mr. Janis testified that he believed the assets in the Manna accounts were marital assets, although he acknowledged that some of the assets originally came from Mrs. Janis's inheritance. He claimed that Mrs. Janis had made a gift to him up to the amount of his ownership interest and asked that the assets be distributed in accordance with the ownership interests. He also claimed that some marital assets had been put in accounts under Mrs. Janis's name only for liability purposes.

{¶ 22} Relying on Mrs. Janis's testimony and exhibits, the court found that the investment in Manna attributable to marital property was $85,714. It distributed the Manna assets as follows: 13% to be divided equally between the parties, representing the marital share of the partnership; 3.89% and 8.23% to the parties' two sons, James and Tyler,

respectively; and the remainder to Mrs. Janis as her separate property. This formula awarded 74.88% of Manna to Mrs. Janis as her separate property and 6.5% as her share of the marital property. The trial court also gave Mrs. Janis the option to buy out Mr. Janis's interest in Manna in a specified manner.

{¶ 23} In addition to its disposition of the parties' assets, the trial court awarded $38,000 to Mrs. Janis for attorney fees.

{¶ 24} Mr. Janis appeals from the Final Judgment and Decree of Divorce, raising seven assignments of error.

### III

{¶ 25} As a preliminary matter, we will address a motion filed by Mrs. Janis, after the briefs were filed in this appeal, to overrule Mr. Janis's first and second assignments of error as moot, because Mr. Janis had "unconditionally accepted payment for his portion" of the assets at issue therein: the Manna and Ivanhoe assets.

{¶ 26} While the appeal was pending, Mr. Janis was issued and negotiated two checks from Wells Fargo, drawn on the Manna accounts, in the amounts of $20,059.97 and $2,378.88. Mrs. Janis contends that these funds "constitute the entire amount Patrick Janis is due for the Manna assets pursuant to the divorce decree, save approximately $188.00 from the final Manna account to be distributed." Mr. Janis also received a check for $118,494.82 from Key Bank, representing his share of the proceeds from the sale of the Ivanhoe property; he did not deposit this check.

{¶ 27} In her motion, Mrs. Janis contends that, "when a non-appealing party obtains satisfaction of judgment, the issues raised in the appeal are rendered moot and must be

dismissed." She claims that Mr. Janis's acceptance of payment for the Manna and Ivanhoe assets rendered his appeal of these awards moot. She relies on *Blodgett v. Blodgett* (1990), 49 Ohio St.3d 243, 245.

{¶ 28} In several cases, we have noted the unique circumstances in *Blodgett*, wherein the wife accepted the full amount awarded to her in the trial court's judgment and decree of divorce and signed a satisfaction of judgment while an appeal was pending. See, e.g., *Englewood v. Turner*, 178 Ohio App.3d 179, 2008-Ohio-4637, ¶43; *Chase Manhattan Mtge. Corp. v. Locker*, Montgomery App. No. 19904, 2003-Ohio-6665, ¶38. Those facts do not exist in this case. *Blodgett* does not stand for the proposition that any payment toward the satisfaction of a judgment while an appeal is pending renders moot the appeal or any specific issue therein. Mrs. Janis has cited no authority for her suggestion that certain aspects of an appeal can be rendered moot by the actions of the parties without an agreement to that effect and without payment in full.

{¶ 29} Mrs. Janis's argument that the judgment was substantially satisfied relies on the fact that Mr. Janis failed to return a check that was written to him, although he did not deposit or cash the check, because in doing so, he retained access to the funds. We are unpersuaded by Mrs. Janis's argument that substantial satisfaction of a judgment (rather than full satisfaction) can render an appeal moot, or that tendered payment can constitute satisfaction.

{¶ 30} Mrs. Janis's Motion to Overrule Mr. Janis's first and second assignments of error as moot is overruled. We will address all of Mr. Janis's arguments.

IV

Standard of Review

{¶ 31} When dividing married parties' assets and liabilities upon divorce, a court must first determine what is marital property and what is not. The trial court must classify property as marital or separate, and must distribute separate property to the owner, where appropriate. R.C. 3105.171(B) and (D). A trial court's classification of property as marital or separate must be supported by competent, credible evidence. *Mays v. Mays,* Miami App. No. 2000-CA-54, 2001-Ohio-1450; *Renz v. Renz,* Clermont App. No. CA2010-05-034, 2011-Ohio-1634, ¶17.

{¶ 32} Classification of property is governed by R.C. 3105.171. R.C. 3105.171(A)(3)(a) provides, in pertinent part, that marital property includes:

{¶ 33} "(i) All real and personal property that currently is owned by either or both of the spouses, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;

{¶ 34} "(ii) All interest that either or both of the spouses currently has in any real or personal property, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;

{¶ 35} "(iii) Except as otherwise provided in this section, all income and appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage."

{¶ 36} Under R.C. 3105.171(A)(6)(a), separate property is defined, in pertinent part, as "all real and personal property and any interest in real or personal property that is found by the court to be any of the following:

{¶ 37} "(i) An inheritance by one spouse by bequest, devise, or descent during the course of the marriage;

{¶ 38} "(ii) Any real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage;

{¶ 39} "(iii) Passive income and appreciation acquired from separate property by one spouse during the marriage."

{¶ 40} "The commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable."  R.C. 3105.171(A)(6)(b).  "[T]he holding of title to property by one spouse individually or by both spouses in a form of co-ownership does not determine whether the property is marital or separate property.  Instead, the couple's total circumstances are reviewed."  *Nuding v. Nuding* (Dec. 7, 1998), Mercer App. No. 10-97-13, citing *Mayer v. Mayer* (1996), 110 Ohio App.3d 233, 236; R.C. 3105.171(H).

{¶ 41} The burden of proof that specific property is not marital but separate is upon the proponent of the claim to prove by a preponderance of the evidence.  *Peck v. Peck* (1994), 96 Ohio App.3d 731, 734; *Snyder v. Snyder*, Clark App. No. 2002-CA-6, 2002-Ohio-2781.  "Oral testimony as evidence, without corroboration, may or may not satisfy the burden."  *Maloney v. Maloney,* 160 Ohio App.3d 209, 2005-Ohio-1368, ¶23, citing *Fisher v. Fisher,* Montgomery App. No. 20398, 2004-Ohio-7255.  "Because traceability presents a question of fact, we must give deference to the trial court's findings, and the court's decision on the matter will not be reversed as against the manifest weight of the evidence when it is supported by competent credible evidence."  Id., citing *C.E. Morris*

*Co v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279.

{¶ 42} "Once it is proven that specific property was the separate property of one of the spouses at, or after, the time of the marriage, the burden shifts to the other spouse to prove, by clear and convincing evidence, that the property, or some interest therein, has been given to the other spouse." *Snyder*, supra, citing *Helton v. Helton* (1996), 114 Ohio App.3d 683, 685.

{¶ 43} Then, in considering whether a trial court's division of marital assets and liabilities is fair and equitable, appellate courts review a trial court's decision under an abuse of discretion standard. *Koegel v. Koegel* (1982), 69 Ohio St.2d 355, 357; *Mays,* supra. An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219. A trial court must indicate the basis for its division of marital property in sufficient detail to enable a reviewing court to determine whether the award is fair, equitable, and in accordance with the law. *Young v. Young,* Clark App. Nos. 08CA59 and 08CA61, 2009-Ohio-3504, ¶6; R.C. 3105.171(G).

{¶ 44} We are mindful that marriage is not inherently a business arrangement, and an equitable distribution, by definition, does not account for every financial jot and tittle of the relationship.

V

{¶ 45} Mr. Janis's first assignment of error states:

{¶ 46} "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT AWARDED 74.88% OF THE MANNA LP INVESTMENT ACCOUNTS TO

DEFENDANT, DEBORAH JANIS, AS HER SEPARATE PROPERTY."

{¶ 47} Mr. Janis argues that the trial court erred in awarding Mrs. Janis 74.88% of the Manna investment accounts as her separate property, because she did not trace her contributions to separate property from her inheritance. He also claims that, because the fortress agreement established a joint retirement plan, Mrs. Janis should be presumed to have made an intervivos gift of all separate property that she contributed to Manna up to the percentage of his ownership interest.[2] In refuting Mrs. Janis's claim that only $85,713.82 was marital property, Mr. Janis relies on the fact that there was no documented contribution to Manna in the amount of $85,713.82. He also points out that the parties' tax returns reflected their ownership interests, not their respective contributions to the partnership, and that Mrs. Janis "never questioned" these ownership percentages.

{¶ 48} As discussed above, ownership interests or percentages are not dispositive in determining whether assets are separate or marital. The key issue is traceability. Thus, Mr. Janis's argument that the property must be marital property because Mrs. Janis never challenged the percentages of ownership listed in the partnership agreement or on the tax returns is not determinative.

{¶ 49} Mrs. Janis presented statements from and testified about numerous investment accounts. For a Key Investments Inc. account, listed in Mrs. Janis's name only, Mrs. Janis provided a statement for the period January 30 - February 26, 1999. The amount reflected in the account on the opening date of the statement was $85,713.82; during that month, $40,000

---

[2]Although Mr. Janis characterizes Manna as a retirement plan, the accountant, Talmage, testified that he had no indication from the parties that their purpose was to plan for retirement, and he noted that there are better strategies for retirement planning than fortress plans.

was deposited into that account. Mrs. Janis testified that the funds originally in the account were marital funds, but she deposited the $40,000 from her inheritance. A later statement showed that, on August 27, 1999, this account held $131,466.78. Mrs. Janis also presented a statement from McDonald Investments Inc. (also through Key Bank and reflecting the same account number), in the name of the Manna Limited Partnership, which held $131,466.78 as of August 27, 1999. Mrs. Janis testified that the funds originally located in the Key Investment account were transferred to the McDonald account in Manna's name. (See Ex. J-11). The trial court apparently credited Mrs. Janis's testimony in concluding that $85,713.82 in marital property had been contributed to Manna.

{¶ 50} Mrs. Janis testified about several other accounts in her own name into which she had initially deposited funds from her inheritance, but which she eventually transferred to Manna accounts. (See Exhibits J-7 through J-14). For example, she presented and testified about a statement from McDonald Investments (through Key Bank), showing an account with a prior statement balance of $154,732.28 and a current balance of $0.00, dated February 29, 2000 (Ex. J-12). The account was titled in her name, payable on death to Mr. Janis. Mrs. Janis testified that the funds in this account were transferred to another McDonald Investment account, and she supported this testimony with Exhibit J-13, a McDonald account statement, dated February 29, 2000 and titled to Manna Limited Partnership. Exhibit J-13 showed a prior statement value of $0.00 and a current value of $163,576.58. According to Mrs. Janis, these statements reflect the transfer of her inherited assets to Manna.

{¶ 51} Similarly, Mrs. Janis presented documentation and testified about a Smith Barney account in her name which held $294,824.75 in November 1999 (Exhibit J-14), and a

letter of Authorization to Transfer Assets (Exhibit J-15), signed by Mrs. Janis, which authorized the transfer of assets in the same Smith Barney account to Manna Limited Partnership in November 1999. She presented her own testimony and documentation about several other accounts into which substantial amounts had been deposited in her name from her inheritance between August 1998 and February 2000. The documents showed that the accounts were eventually emptied, and Mrs. Janis testified that the funds were transferred to Manna. Mrs. Janis testified that no marital funds had been deposited into any of these accounts, except for the $85,713.82 deposited into the Key Bank account, as described above.

{¶ 52} Mrs. Janis also presented Mr. Updyke's will, which named Mrs. Janis as his sole heir, and the Inventory and Appraisal of Mr. Updyke's estate from the Montgomery County Probate Court, which showed that the estate had total assets of $768,356.91.

{¶ 53} Mr. Janis testified that approximately $20,000 in marital assets was initially invested in Manna. He acknowledged that Mrs. Janis had put funds into Manna that were from her separate property, but he claimed that the parties had agreed "that they would be our joint funds to the extent of our ownership interest" of 49.5%. Thus, he argued that, to the extent that Mrs. Janis's contribution exceeded her ownership share, she had made a gift of those funds to him. He also argued that the parties' joint gifts to their sons demonstrate that the funds were marital funds, because he "could not gift something to his sons that he did not own."

{¶ 54} Mr. Janis also relied on the testimony of the parties' accountant, Doug Talmage, in support of his argument that the parties had intended to have equal interests in the property contributed to the fortress plan. Talmage testified that the parties had expressed

to him their intention to have equal ownership interests in the fortress plan and that the documents were drafted to reflect this request. He further testified that he did not discuss the source of the money with Mrs. Janis and that she never indicated to him that she was depositing more than half of the money for the investments. Talmage resisted efforts by Mr. Janis's attorney to characterize the payments into the account as "gifts;" he used the term "investments."

{¶ 55} Mr. Janis also relies on the limited partnership agreement and tax returns, which included the parties' respective ownership interests in Manna.[3] Mrs. Janis points out, however, that the limited partnership agreement also called for the maintenance of accounts reflecting each limited partner's capital contributions (Section 2.3.2) and for the repayment of capital accounts (or a proportionate share of the capital accounts, if insufficient funds remained to pay in full) upon liquidation or dissolution of the partnership (Section 9.3(f)).

{¶ 56} Based on the evidence presented, the trial court reasonably concluded that Mrs. Janis had traced a substantial portion of the assets in Manna to her inheritance. She substantiated the amount of her inheritance and provided documentation of the accounts into which those funds were initially deposited. She testified and documented that those accounts were closed or emptied after the Manna Limited Partnership Agreement was executed, and she testified that the funds in those accounts were transferred to Manna. Mrs. Janis provided documentation for some, but not all, of the deposits into the Manna accounts,

---

[3] The parties do not dispute that each owned 49.5% when the limited partnership was formed, and the tax returns do reflect this fact. However, the document upon which they rely to substantiate this number — "Exhibit B," an attachment to trial court Defendant's Exhibit J, the Agreement of Limited Partnership of Manna Ltd.— is incomplete with respect to the percentages.

claiming that some bank records had been destroyed.

{¶ 57} Mr. Janis did not claim that funds has been deposited into Manna from any other source, except for a relatively small contribution from marital assets. (Mrs. Janis acknowledged a larger marital contribution.) His position was based on the ownership percentages as evidence of donative intent and on his own testimony that Mrs. Janis intended to make a gift to him up to the amount of his ownership percentage.

{¶ 58} As we discussed above, co-ownership does not, in itself, determine whether property is marital or separate property. R.C. 3105.171(H); *Nuding*, supra. Moreover, the trial court's determination of traceability is a factual question to which we must show deference unless it is against the manifest weight of the evidence. *Maloney* at ¶23. There was competent, credible evidence from which the trial court could have concluded that only $85,714 of the funds in Manna was marital property. That sum represented 13% of the total capital contributions to Manna, as found by the trial court.[4] Mr. Janis was awarded half of that amount, or 6.5%. The trial court did not err in this calculation.

{¶ 59} We express no opinion as to whether Mrs. Janis and her sons were awarded the appropriate percentages of ownership in Manna under the trial court's calculations. The only issue pertinent to this appeal is whether the court acted reasonably in awarding Mr. Janis the percentage that it did.

{¶ 60} The first assignment of error is overruled.

VI

---

[4] The trial court found that the following contributions had been made to Manna: $550,909 by Mrs. Janis from her separate property, $85,714 from marital assets; and $22,500 from the Janises' son, Tyler. Thus, the total capital contribution was $659,123. The marital contribution of $85,714, as found by the trial court, was 13% of $659,123.

{¶ 61} Mr. Janis's second assignment of error states:

{¶ 62} "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT AWARDED $52,000 OF THE VALUE OF THE MARITAL RESIDENCE TO DEFENDANT, DEBORAH JANIS, AS HER SEPARATE PROPERTY."

{¶ 63} Mr. Janis contends that the trial court erred in the amount it credited Mrs. Janis for her contribution of separate property to the marital residence.

{¶ 64} With respect to the parties' interests in the Hadley property, the trial court's final judgment and decree of divorce stated:

{¶ 65} "The Hadley Avenue property was the pre-marital home of [Mrs. Janis]. The parties obtained a swing loan of $39,000.00 for the purchase of their home on Ivanhoe Avenue.

{¶ 66} They used the equity in [Mrs. Janis's] pre-marital home as security. The value of this property on the date of marriage was $73,000.00. The value of the date of sale was $100,000.00. During the time that the parties lived in the Hadley Avenue real estate, they did some repairs and remodeling. Who did what and how much is the subject of debate between the two. However, it is undeniable that [Mr. Janis] contributed some money and time to these improvements. It is not possible to determine from the evidence exactly how much was done or paid by the parties. Therefore, the increase in value of the property of $27,000.00 is ORDERED divided equally. Further, [Mrs. Janis] is entitled to the first $39,000.00 out of the proceeds of the sale of Ivanhoe *** as reimbursement for her contribution to the swing loan. ***"

{¶ 67} In its order related to the sale of the Ivanhoe property, the trial court ordered

the house to be sold, noting that Mr. Janis's "lack of cooperation [had] caused the delay in the sale of the house." "After the costs of the sale are paid, [Mrs. Janis] shall be reimbursed for the contribution she made from her pre-marital home ($39,000 swing loan) and her one-half of the increase value of the Hadley real estate ($13,500) for a total of $52,500.00. Thereafter, the net sale proceeds shall be divided equally between the parties."

{¶ 68} Both parties testified that they had made numerous improvements to the house on Hadley after their marriage, but neither presented evidence that would have allowed the trial court to place a monetary value – other than the total appreciation of the property – on those improvements. Thus, the trial court acted reasonably in dividing the appreciation in the Hadley house equally between the parties.[5]

{¶ 69} The trial court's decision to credit Mrs. Janis for the full value of the swing loan is less sound. It is undisputed that equity in the Hadley property was used as collateral for the swing loan, which apparently served as a down payment on the new house. As we discussed above, the Hadley house had appreciated $27,000 between the date of the marriage and the date of the sale, so $27,000 of the total equity in the house was attributable to marital property. Mrs. Janis did not present any evidence regarding how much she owed on the house at the time of the marriage or at the time of the sale. Accordingly, there was no basis on which the court could have concluded that Mrs. Janis had $39,000 in equity – over and

_____

[5] In her brief, Mrs. Janis suggests that the trial court divided the $27,000 of appreciation in the Hadley home between the date of the marriage and the date of the divorce so as to treat half of it as separate property and half as marital property. The judgment does not support this interpretation. The trial court ordered that the appreciation during the marriage be "divided equally." In our view, this order meant that the appreciation was to be divided equally *between the parties*, not that half be treated as separate property and half be treated as marital property. In dividing the appreciation between the parties, the trial court treated all of the appreciation as marital property.

above the $27,000 in marital equity – that was attributable solely to her separate property.

{¶ 70} The trial court concluded that the total value of Hadley could not be treated as separate property, because some of the appreciation in its value was due to marital efforts and investment. Without evidence substantiating that Mrs. Janis had $39,000 in equity in addition to the marital appreciation on the property, the court could not have reasonably concluded that all of the equity used to obtain the swing loan was separate property. For that reason, the trial court erred in concluding that all of the equity used for the swing loan was separate property and in ordering that Mrs. Janis receive payment for this amount from the proceeds of the Ivanhoe sale. It does appear, however, that at least $12,000 ($39,000 - $27,000) of the swing loan was separate property.

{¶ 71} Mr. Janis also contends that the trial court erred to his detriment in its calculation of how monies should be paid out upon the sale of the Ivanhoe property. Mr. Janis argues that the trial court awarded Mrs. Janis her equity in the Hadley house twice and did not award him his share of the equity at all. He contends that "[t]here was only $39,000.00 in question," but the court awarded $52,500 to Mrs. Janis, and then it divided the remainder of the proceeds from Ivanhoe "without giving [him] his one half of the marital portion [$13,500]."

{¶ 72} The trial court did err in awarding Mrs. Janis her equity in the proceeds from the Ivanhoe home before the balance of the proceeds was divided and failing to do the same for Mr. Janis. From the sale of Ivanhoe, Mrs. Janis should receive the amount of the swing loan that can be traced to separate property ($12,000), plus $13,500 representing half of the marital appreciation on Hadley, for a total of $25,500. Mr. Janis should receive $13,500

(half of the marital appreciation) as well. The remaining proceeds should be divided equally.

{¶ 73} The second assignment of error is sustained.

VII

{¶ 74} Mr. Janis's third assignment of error states:

{¶ 75} "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT AWARDED $38,000.00 TO DEFENDANT, DEBORAH JANIS, FOR HER ATTORNEY FEES."

{¶ 76} Mr. Janis argues that the trial court's award of attorney fees was not warranted and that it demonstrated the trial court's bias against him. Mr. Janis does not challenge the court's authority to make such an award. Rather, he contends that the trial court's award was improper because it was based on unjustified animosity toward him and his attorney, Ms. Crossman, at the first hearing.

{¶ 77} Although the trial court did not expressly rely on R.C. 3105.73(A), which governs the award of attorney fees and litigation expenses in a domestic relations case, we presume that the fees were awarded pursuant to this statute. R.C. 3105.73(A) provides: "[A] court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable. In determining whether an award is equitable, the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate."

{¶ 78} We review of a trial court's decision to award attorney fees under an abuse of

discretion standard. *Kapadia v. Kapadia*, Cuyahoga App. No. 94456, 2011-Ohio-2255. ¶93. See, also, *Howell v. Howell,* 167 Ohio App.3d 431, 2006-Ohio-3038, ¶61. We may not substitute our judgment for that of the trial court unless, when considering the totality of the circumstances, we conclude that the trial court abused its discretion. *Holcomb v. Holcomb* (1989), 44 Ohio St.3d 128, 131.

{¶ 79} Much of the parties' disagreement over the appropriateness of an award of attorney fees focuses on who was at fault in creating the need for a second hearing. Mr. Janis contends that the second hearing was necessitated by the judge's unreasonable, arbitrary and biased decision at the close of the first hearing. He claims that the court recognized that its first decision, which was issued from the bench at the end of the first hearing, was not supported by the record and, for that reason, decided to take additional evidence. Mrs. Janis contends that Mr. Janis created the need for the second hearing because he and his attorney did not cooperate in providing documentation that was needed to resolve all of the issues at the first hearing. She also points out that Mr. Janis requested the second hearing.

{¶ 80} At the end of the first hearing, the trial court expressed a desire to award attorney fees, but it did not do so:

{¶ 81} "I really would like to award some attorneys' fees. I just don't think I can. *** I would award her attorney's fees. It's been, you know, a fight from the beginning. Ms. Crossman, you have exacerbated that fight, you've made it worse. On that basis I think you and your client should be ordered to pay attorney's fees but I don't have enough evidence to do it to be honest with you."

{¶ 82} When Mr. Janis sought another hearing after he had retained different counsel,

the court commented on the "tortured history" of the case and its disappointment with Mr. Janis's previous counsel's handling of the case. The court acknowledged that "I think that disappointment in actuality or in appearance is going to come through in the record. I think honestly she [Ms. Crossman] did not believe that that case was going to trial that day when it did go to trial. *** My frustration will be obvious to the Court of Appeals and I don't know what they'll do with it. There's some likelihood they'll reverse me."

{¶ 83} The court proceeded to discuss the time that would be lost by the parties if the matter were appealed, reversed, and remanded for further proceedings before this judge or another judge. The court also cautioned the parties that he would "probably" award some attorney fees to Mrs. Janis if another hearing were held, because "most of the cost of that really was brought about by the other side." The court then encouraged the parties to talk with their lawyers about whether they wanted to "work this out," to go to the court of appeals, or to have a "new trial." The parties agreed to have further proceedings in the trial court, subject to certain conditions and limitations upon which they also agreed.

{¶ 84} At the second hearing, Mrs. Janis presented evidence about the amount and reasonableness of her attorney fees. Mr. Janis does not challenge the reasonableness of the fees. Based on Mrs. Janis's attorneys' billing records, a domestic relations attorney, Douglas Gregg, testified that the fees incurred by Mrs. Janis in the case were reasonable, that the case appeared to have been "extremely litigious," that the fees amounted to $30,000 to $35,000 before the date of the second hearing, and that amount was in the "low" range of what might be expected, considering the value of the assets in dispute.

{¶ 85} In its Final Judgment and Decree of Divorce, the court ordered Mr. Janis to

pay $38,000 to Mrs. Janis for her attorney fees. The judgment stated:

{¶ 86} "It is true in this case that both parties bear some fault for the tortured procedural history of the case. However, the Court finds that much more of the blame falls upon [Mr. Janis] than upon [Mrs. Janis]. [Mr. Janis] was not candid, forthcoming or cooperative in the discovery process. But most importantly, it was [Mr. Janis's] actions just before and during the first trial that the Court finds repugnant. He and his previous counsel are the direct and proximate cause of the failure of evidence at the first trial and the necessity of the second trial. The request by [Mrs. Janis] for $38,000.00 in attorney fees is found well taken and hereby granted. The Court finds that the award is equitable under the circumstances of the case and the evidence establishes that the fees are reasonable and the work required was necessary. The award, while it finds some justification on the basis of the income of the parties, is more solidly founded on the conduct of [Mr. Janis] and his previous counsel. [Mrs. Janis's] request for attorney fees in the civil case[6] is hereby denied."

{¶ 87} Considering all of the circumstances of the case, the trial court abused its discretion in ordering Mr. Janis to pay an amount that appears to have been intended to cover all of Mrs. Janis's attorney fees. It was not an abuse of discretion for the court to find that Mr. Janis and Ms. Crossman caused unnecessary litigation and delay, but only a portion of Mrs. Janis's attorney fees were directly attributable to such conduct. Neither the expert witness nor Mrs. Janis attempted to define the amount of her attorney fees that was

---

[6] The trial court's reference to "the civil case" means the case brought against Cavalier Manor by the Ohio Civil Rights Commission, based on alleged discrimination against a disabled person. Mrs. Janis did not trust Mr. Janis to protect her interests in these proceedings, so she hired her own attorney, in addition to the attorney employed on behalf of Mr. Janis and Cavalier Manor, to represent her interests in the case. Mrs. Janis paid approximately $8,000 in attorney fees in that case.

attributable to unwarranted conduct by Mr. Janis and his attorney. Moreover, Mrs. Janis left the marriage with more assets than Mr. Janis. Although these assets are traceable to her separate property, they are relevant to her ability to pay her own fees. Mrs. Janis testified that she had used credit cards and cashed some certificates of deposit to pay her attorney fees, but her testimony did not indicate that the fees had created a great hardship.

{¶ 88} The trial court reasonably concluded that Mr. Janis's failure to produce documents and to execute releases in a timely fashion led to the exclusion of many exhibits at the first hearing, which led, at least in part, to the need for the second hearing. Moreover, the trial court informed Mr. Janis before agreeing to conduct a second hearing that it would be inclined to award attorney fees to Mrs. Janis if a second hearing were held. We do not disagree with the trial court that some compensation for delay caused by Mr. Janis's conduct was appropriate. However, we cannot conclude that ordering him to pay *all* of Mrs. Janis's attorney fees was equitable under the circumstances.

{¶ 89} The third assignment of error is sustained.

VIII

{¶ 90} Mr. Janis's fourth assignment of error states:

{¶ 91} "THE TRIAL COURT'S ENTIRE DECISION IS TAINTED BY BIAS AND PREJUDICE."

{¶ 92} Mr. Janis claims that the trial court's treatment of the loans made to Cavalier Manor demonstrated the court's bias against him. Specifically, he points out that the trial court questioned the credibility of his testimony about the loans to Cavalier Manor, yet ordered him to repay them.

{¶ 93} Judicial bias has been described as a "hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts." *State ex rel. Pratt v. Waygandt* (1956), 164 Ohio St. 463, paragraph four of the syllabus.

{¶ 94} "A judge is presumed to follow the law and not to be biased, and the appearance of bias or prejudice must be compelling to overcome these presumptions." *In re Disqualification of George*, 100 Ohio St.3d 1241, 2003-Ohio-5489, ¶5; *Rejas Invests. v. Natl. City Bank,* Montgomery App. No. 21243, 2006-Ohio-5586, ¶98. Intermediate appellate courts, such as this one, have no jurisdiction to disqualify a judge based on claims of bias; such claims must be brought to the Chief Justice of the Ohio Supreme Court. See *Beer v. Griffith* (1978), 54 Ohio St.2d 440, 441-442.

{¶ 95} If there were a concern during these lengthy proceedings that the judge was exhibiting "bias and prejudice," Mr. Janis should have raised the issue at the time and not waited for the appeal. See, e.g., *State v. VFW Post 431*, Montgomery App. No. 19892, 2004-Ohio-3566, ¶69. Moreover, although the court explicitly stated its frustration, we find no basis in this record of a "fixed anticipatory judgment on the part of the judge."

{¶ 96} Mr. Janis's argument that the court erred in its handling of the debt on Cavalier Manor will be addressed under the sixth assignment of error.

{¶ 97} The fourth assignment of error is overruled.

IX

{¶ 98} Mr. Janis's fifth assignment of error states:

{¶ 99} "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT FAILED TO CONSIDER MARITAL DEBTS IN THE DISTRIBUTION OF MARITAL PROPERTY AND, IN ESSENCE, LEFT THE PLAINTIFF, PATRICK JANIS, TO PAY THEM."

{¶ 100} Mr. Janis contends that the trial court erred in failing to give him credit for marital debt that he repaid – by making mortgage payments on the marital home – after the de facto termination of the marriage. He claims that the trial court's handling of the marital debt was arbitrary and unreasonable because, if the house had been sold on September 30, 2005, it would have been encumbered by a mortgage and Mrs. Janis would have had to share equally in the debt.

{¶ 101} Mr. Janis's argument ignores the fact that he lived in the family home during the parties' separation, while Mrs. Janis lived in a relatively small apartment with their son. In other words, Mr. Janis had the sole benefit of the home for several years, and Mrs. Janis did not; her living arrangement was not comparable to his. For these reasons, the trial court did not abuse its discretion in failing to require Mrs. Janis to contribute to the mortgage payments made after the date of the end of marriage.

{¶ 102} The fifth assignment of error is overruled.

X

{¶ 103} The sixth assignment of error states:

{¶ 104} "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT DENIED PLAINTIFF HIS REQUEST FOR REIMBURSEMENT OF FUNDS LOANED TO CAVALIER MANOR PARTNERSHIP."

{¶ 105} Mr. Janis claims that the trial court abused its discretion when it refused to reimburse him for money he loaned to Cavalier Manor in February 2008, July 2008, and February 2009 to pay property taxes. According to Mr. Janis, Pennywise had also loaned Cavalier Manor $4,000 to pay property taxes. (Mr. Janis managed Cavalier Manor and the Lonsdale property while the divorce was pending.)

{¶ 106} The trial court's decision with respect to the reimbursement of the loan must be viewed in the context of all of its decisions with respect to the Lonsdale property and Cavalier Manor.

{¶ 107} The trial court found that Mrs. Janis had contributed $85,111 from her inheritance toward the purchase of the Lonsdale property. The loan was in Mr. Janis's name because Cavalier Manor could not obtain financing, so Mrs. Janis transferred the $85,111 to Mr. Janis. The trial court found that, in doing so, Mrs. Janis signed a gift letter "required by the lender to insure the superiority of its security position in the real estate," and that the lender "no doubt relied upon it." The court concluded that the execution of the gift letter, "taken together with all of her actions and lack of actions with regard to the asset" made it improper for Mrs. Janis to claim that she was entitled to reimbursement for the contribution.

{¶ 108} The court also considered the loans which Mr. Janis claimed to have made to Cavalier Manor while the divorce was pending. It found that much of Mr. Janis's testimony about the need for him and for Pennywise to make loans to cover Cavalier Manor taxes "was not worthy of belief and *** unpersuasive." Based on these conclusions, the court refused to reimburse Mr. Janis for the alleged loans.

{¶ 109} Considering the trial court's findings with respect to Mr. Janis's credibility

and its refusal to credit Mrs. Janis for the separate property she contributed to acquire the Lonsdale apartment building that was Cavalier Manor's primary asset, the trial court did not abuse its discretion in refusing to credit Mr. Janis for any property taxes he paid from his own money.

{¶ 110} The loan from Pennywise will be discussed under the seventh assignment of error.

{¶ 111} The sixth assignment of error is overruled.

XI

{¶ 112} The seventh assignment of error states:

{¶ 113} "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT ORDERED PLAINTIFF TO PAY $4,533.22 TO THE DEFENDANT, DEBORAH JANIS, AS HER INTEREST IN PENNYWISE."

{¶ 114} Mr. Janis claims that the amount awarded to Mrs. Janis from Pennywise was disproportionate to her share of ownership and constituted an abuse of discretion.

{¶ 115} The trial court awarded Pennywise to Mr. Janis, but it ordered him to reimburse Mrs. Janis for her share of the corporation's assets. The trial court found that Pennywise had $5,106.44 in assets at the end of the marriage and that Mr. Janis had loaned $4,000 from Pennywise to Cavalier Manor while the divorce was pending. The court ordered Mr. Janis to repay the $4,000 loan,[7] bringing the Pennywise assets to $9,106.44, and then awarded Mrs. Janis half of that amount, or $4,553.22. Mr. Janis contends that this

---

[7] In her brief, Mrs. Janis acknowledges that Mr. Janis "did not receive the $4,000 loan from Pennywise himself," but transferred the money to Cavalier Manor. However, she claims that such a transfer was necessitated by Mr. Janis's mismanagement.

award was "not founded upon logic or reason" and that the $4,000 loan came from Pennywise's $5,106.44 in assets on hand at the end of the marriage.

{¶ 116} Mrs. Janis testified that she had contributed separate property to the limited partnerships that were shareholders in Pennywise (Manna and Cavalier Manor), but it does not appear that she contributed any separate property directly to Pennywise. Thus, we must assume that the Pennywise assets are marital assets. It also does not appear that Pennywise held substantial assets, although Mr. Janis testified that Pennywise collected management fees from the limited partnerships.

{¶ 117} Mr. Janis contends that the trial court erred in awarding Mrs. Janis half of the Pennywise assets because her ownership share was only 33%. We agree. When the parties created Pennywise, they gave their sons and the Dayton Foundation interests totaling 34%, and they each retained a 33% interest. Mrs. Janis made no claim that the money in Pennywise was traceable to her separate property. In the absence of any evidence that some of the assets were traceable to Mrs. Janis's separate property, we see no basis for the trial court's decision to award her more than 33% of Pennywise. It appears that the trial court simply overlooked the fact that the parties did not own 100% of the corporation.

{¶ 118} In support of the trial court's award, Mrs. Janis contends in her brief that the "trial court determined that Patrick Janis's unreasonable actions weighed in favor of [Mrs. Janis] receiving a greater portion of the value of Pennywise." But the trial court's judgment does not contain any finding that Mr. Janis acted unreasonably in his management of Pennywise or the limited partnerships.

{¶ 119} Mr. Janis also claims that the $4,000 loan from Pennywise to Cavalier Manor

came from the $5,106.44 in assets that Pennywise held at the end of the marriage. There is no support for this assertion in the record, and the trial court implicitly rejected it. Mr. Janis testified that Pennywise received management fees from the limited partnerships. Because it is possible that the loan came from Pennywise's income, the trial court did not abuse its discretion in concluding that the 2007 loan to Cavalier Manor to pay property taxes did not come from the assets on hand in September 2005.

{¶ 120} As her share of Pennywise, the trial court should have awarded Mrs. Janis 33% of $9,106.44 (the amount the trial court assigned to Pennywise's assets), or $3.005.13.

{¶ 121} The seventh assignment of error is sustained.

XII

{¶ 122} The judgment of the trial court will be affirmed in part, modified in part, reversed in part, and remanded for further proceedings.

. . . . . . . . . .

GRADY, P.J. and FAIN, J., concur.

Copies mailed to:

Jose M. Lopez
Christopher R. Conard
Sasha Alexa VanDeGrift
Hon. Denise L. Cross, Administrative Judge