**[Cite as *Leary v. Leary*, 2026-Ohio-1396.]**

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| CHRISTINA LEARY | : | |
| | : | C.A. No. 30471 |
| Appellant | : | |
| | : | Trial Court Case No. 2021 AN 00012 |
| v. | : | |
| | : | (Appeal from Common Pleas Court- |
| JONAH M. LEARY | : | Domestic Relations) |
| | : | |
| Appellee | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on April 17, 2026, the judgment of the trial court is reversed in part and affirmed in part.

Costs to be paid by Appellant.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

_____
RONALD C. LEWIS, JUDGE

HUFFMAN, J., and HANSEMAN, J., concur.

ANTHONY C. SATARIANO, Attorney for Appellant
JENNIFER L. BROGAN, Attorney for Appellee

LEWIS, J.

{¶ 1} Plaintiff-appellant Christina Leary appeals from a final judgment and decree of divorce entered in the Montgomery County Court of Common Pleas, Domestic Relations Division, terminating her marriage to defendant-appellee Jonah M. Leary. For the following reasons, the judgment is reversed in part and affirmed in part.

## I. Factual and Procedural History

{¶ 2} Christina and Jonah were married on July 7, 2021.[1] Christina filed for an annulment on December 28, 2021, which alleged that no children had been born of the marriage and that the marriage was never consummated. Jonah filed an answer denying that the marriage was not consummated. Upon the parties' separate motions, the trial court issued temporary restraining orders enjoining the parties from, among other things, disposing of any real or personal property.

{¶ 3} In May 2022, one child was born of their marriage through in vitro fertilization ("IVF"). Several motions were filed with the trial court regarding temporary custody of the minor child. During the pendency of this matter, the child was removed from Christina's custody by Montgomery County Children Services ("Children Services") and was the subject of an active child protective services case in the Montgomery County Juvenile Court. Due to those proceedings, the allocation of parental rights and responsibilities and child support were fully resolved through the juvenile court rather than the domestic relations court.

---

1. For clarity and convenience, the parties are identified by their first names.

{¶ 4} On July 24, 2024, Jonah filed a counterclaim for divorce that alleged "one or more grounds [for divorce] pursuant to Ohio Revised Code §3105.01, the full particulars of which will be made known to the Court upon a final hearing of this cause."   Jonah further alleged that Christina committed financial misconduct.   Christina did not file an answer or other responsive pleading.

{¶ 5} The magistrate issued a decision denying Christina's complaint for an annulment for failure to prove statutory grounds for an annulment.   On September 12, 2024, the trial court adopted the magistrate's decision and dismissed Christina's complaint.   That order was not appealed and the case proceeded with Jonah's counterclaim for divorce.   A final telephone pretrial was scheduled for November 15, 2024, and a final hearing date was scheduled for March 6, 2025.

{¶ 6} On October 1, 2024, Christina filed a motion seeking relief from the court's temporary mutual restraining order for permission to sell her premarital vehicle, a 2020 Toyota Sienna, due to financial hardship.   The motion stated that the vehicle was a premarital asset paid off prior to the parties' marriage and owned solely in Christina's name. Christina's motion was granted on October 3, 2024.

{¶ 7} On October 4, 2024, Jonah filed an expedited motion to vacate the October 3, 2024 entry and to reinstate the temporary restraining order because the 2020 Toyota Sienna was a marital asset.   That same day, Christina filed a motion to dismiss as moot Jonah's expedited motion, because the vehicle had already been sold.   Approximately two hours later, Jonah filed an emergency motion asking the court to order Christina to deposit the funds she received for the sale of the vehicle with the clerk of court's office.

{¶ 8} Following a telephone conference, the trial court issued an October 8, 2024 order that denied Jonah's expedited motion as moot, granted Christina's motion to dismiss

Jonah's expedited motion, and granted in part Jonah's emergency motion. The court ordered that all remaining funds from the sale of the vehicle be deposited into Christina's counsel's IOLTA account. The case proceeded to trial on Jonah's counterclaim.

### A. Jonah's Testimony

{¶ 9} Jonah testified at the final divorce hearing that he met Christina online on OkCupid in January 2021. Jonah did not have any children at that time, but Christina had five children. When Christina asked if Jonah wanted children, he stated that he did but said that he would be happy if the person he married already had children. Christina said that she wanted a child with whomever she married. Approximately three weeks after they met in person, Christina told Jonah that her doctor warned her she would no longer be able to have children within a year. Christina sounded very urgent that she needed and wanted to have another child soon. Christina said she had a condition in which she could not give birth naturally and had to use IVF. After Jonah agreed to have a child with Christina, she told him that her IVF doctor refused to treat her unless she was married, so Christina convinced Jonah to get married. Christina asked Jonah to marry her, and they were married on July 7, 2021.

{¶ 10} Prior to their marriage, Christina owned a home subject to a mortgage on Mesmer Avenue in Dayton, Ohio. In May 2021, Jonah moved in with Christina and her five children, who ranged in age from two to seven years old. Jonah's name was not on the deed or the mortgage for the property.

{¶ 11} Before moving in with Christina, Jonah had worked at Wright-Patterson Air Force Base as a civil engineering project manager for about two years. Christina did not work before or during the marriage. Instead, she received social security benefits. Christina told Jonah to quit working because his income was too high. She believed she

4

would lose her social security benefits, and she did not think that they could live off Jonah's salary. Jonah did not agree with Christina and tried to explain that his net income was low due to the level of his payroll deductions for retirement savings and that if he decreased his contributions, his income would be sufficient. Although Jonah tried to keep working as long as he could, Christina got angry and accused him of not caring about the family. Jonah finally quit his job in June 2021, but Christina said he should not have done it because she was trying to figure things out with social security.

{¶ 12} On May 22, 2021, Jonah and Christina opened a joint Fifth Third Bank account ("joint account"). Christina had her own Fifth Third Bank account ending in x9047. Jonah was not on Christina's x9047 account and did not have access to it. As of May 22, 2021, the beginning balance in the joint account was $0.00. As of June 17, 2021, the ending balance was $0.00. Between May 22 and June 17, 2021, 14 deposits were made into the joint account that totaled $92,942.07. In that same time frame, 19 withdrawals were made from the joint account that totaled $92,942.07. The entire balance of the joint account was transferred to Christina's x9047 account.

{¶ 13} Jonah had a Thrift Savings Plan retirement account ("TSP") through his employment. As of April 1, 2021, Jonah had a balance of $37,813.66 in his TSP. On June 3, 2021, Jonah withdrew $35,441.00 and moved it to the joint account per Christina's request. Although there was some money left in Jonah's TSP, at the time he withdrew the money, he thought it was the entirety of his account.

{¶ 14} As of June 8, 2021, Jonah had a Vanguard Roth IRA account ("Vanguard") in the amount of $22,036.40. The entire amount was withdrawn at Christina's request and placed into their joint account via a wire transfer on June 9, 2021, minus $10.00 for the cost of the wire transfer.

{¶ 15} Jonah had an account at Wright-Patterson Credit Union ("WPCU") in the amount of $26,997.76 as of May 1, 2021. On May 11, 2021, he withdrew $7,350.00 at Christina's request. That same day, Jonah withdrew another $6,000.00 at Christina's request. Both withdrawals were deposited into the joint account. Jonah's bank records reflect that the entirety of the balance in his account was withdrawn and the account closed as of May 24, 2021.

{¶ 16} Jonah did not realize that Christina moved all the money from the joint account into her own account until after all the money was transferred out of the joint account. Christina had wanted Jonah to put the money into the joint account so that she could have easier access to it. The money was supposed to be used primarily for large purchases rather than day-to-day expenses, such as food and utilities. The everyday expenses were supposed to be paid from Christina's social security income.

{¶ 17} Before marriage, Jonah owned a 2016 Chevrolet Cruze. He traded his Cruze in for a 2010 Honda Odyssey because Christina said he needed a van since they had five kids. He paid about $9,000 for the Odyssey, although it was not very good and did not work properly. Christina transferred the title of the Odyssey to her name, and she kept it when Jonah left the marital home in January 2022. Christina later sold the Odyssey to her friend.

{¶ 18} Christina had a 2020 Toyota Sienna that she financed prior to the marriage. The vehicle was titled only in Christina's name. On June 8, 2021, Christina paid off the full amount due on the Sienna, which was $40,144.54. According to Kelley Blue Book, the private party value of the Sienna on July 14, 2023, was $40,029.00. Christina had wanted to enter the marriage debt free and did not want to make monthly car payments anymore. Jonah disagreed with Christina and told her it would be better to have a monthly car payment and keep money in reserve. Christina, however, had already moved the money to her own

6

account by the time that conversation occurred, and Christina was able to do whatever she wanted with the money as Jonah no longer had access to it.

{¶ 19} Jonah denied that he ever had a conversation with Christina about gifting her money to pay off the Sienna. He also denied having had any conversation about paying off the car in front of Christina's friend, Klarissa Underwood. Jonah never intended to gift Christina any money.

{¶ 20} In June 2021, Jonah took out a credit line from Kohl's. At that time, Jonah did not have any money, but his credit score was still good. In September 2021, Jonah used his Kohl's credit card to buy coats for Christina's children and the child of one of Christina's friends in the amount of $799.43. No further purchases were made using the credit card, but at the time of the divorce hearing, due to late fees and interest, the total owed on the account was $1,216.39. Jonah asked that Christina be responsible for that debt.

{¶ 21} On September 12, 2021, Jonah took out a loan in his name for $5,145.35 from Fetch to purchase a dog for the children. Jonah financed the purchase of the dog, but no payments were ever made on the account. Jonah was sued in Fairborn Municipal Court for the full principal amount, late charges, and interest. To settle the lawsuit, Jonah borrowed $4,000 from his parents. Jonah signed a promissory note to repay his parents. When Jonah left Christina's home in January 2022, Christina kept the dog. At some point after Jonah left, the dog died. Jonah asked that Christina be responsible for the $4,000 debt owed for the dog.

{¶ 22} In September 2021, Jonah took out a credit card from Walmart at Christina's request. Jonah purchased two carports and three sheds for Christina's backyard in the amount of $2,490.41. After Jonah put up the carports, Christina had him tear them down and put them by the side of the road to be hauled away. Jonah did not know what happened

to the sheds, but he did not take them with him when he left Christina's home in January 2022. No other purchase or payments were made on the Walmart credit card. At the time of the hearing, the total balance owed, including late fees and interest, was $3,033.04. Jonah asked that Christina be responsible for that debt.

{¶ 23} In September 2021, Jonah took out a credit line from Jared the Galleria of Jewelry ("Jared's") at Christina's request. On September 13, 2021, Jonah purchased necklaces for Christina's friend and her friend's daughter in the amount of $1,921.48. No other purchases or payments were made on the account, but fees and interest accrued. As of February 2022, the total amount owed was $2,364.24, which was sent to collections. Jonah asked that Christina be responsible for that debt.

{¶ 24} Jonah resided with Christina from May 2021 until January 14, 2022. Jonah testified that although Christina was very nice at first, after he moved in with her, he discovered that she was not a good person and was abusive. Once Christina became pregnant through IVF, her behavior and the relationship changed. Christina said "very nasty" things to Jonah and was physically and emotionally abusive to him. Christina would make things up to have an excuse to be angry at him. Jonah stated that Christina had a very bad temper and hit him a few times. At some point, Jonah was no longer permitted to sleep in the same bed as Christina, and he had to sleep on the floor in the attic. Christina told Jonah that he was not allowed to shower anymore because he used too much water. Jonah became dirty and uncomfortable, and he did not have any clean clothes. Christina also did not allow Jonah to sit on the furniture because he was always in her way and made him sit in the corner.

{¶ 25} Jonah testified that Christina controlled everyone's access to food. Christina withheld food from Jonah and the male children in the household, stating that they did not

8

deserve to eat. They were given cereal bars and PediaSure to stay alive. Jonah's height was five feet, ten inches, and his normal weight was 180 pounds. By January 14, 2022, Jonah weighed only 140 pounds.

{¶ 26} Christina also controlled Jonah's communications. When they first were together, Jonah was on a phone plan with his family, but Christina did not approve. Christina had Jonah turn in his old phone and she gave him a new one. However, within a few weeks, Christina took Jonah's phone away because she said she did not trust him with it. Christina claimed that Jonah was calling his family behind her back, which was not true. Jonah was permitted to talk to his parents only through Christina, and she told him to say mean and hurtful things to them. Jonah was very uncomfortable saying mean things to his parents, but eventually Christina took over the conversations and Jonah no longer spoke with his parents. Christina told Jonah that his parents did not want him anymore, that they were disappointed in him, and that he was on his own.

{¶ 27} On December 28, 2021, Christina filed for an annulment. On January 14, 2022, Christina kicked Jonah out of the home and her friend drove him to a homeless shelter in Dayton. Jonah's parents found out he was at the shelter and picked him up. Jonah was still living with his parents at the time of trial.

{¶ 28} Jonah voluntarily went through IVF with Christina to have a child. He was aware that some of the money he moved into the joint account was for the IVF treatments. After Christina and Jonah's son was born in May 2022, Children Services became involved with Christina. All of Christina's children were removed from the home. Two of the children were permanently placed with their biological father. Three of the children were in separate group homes or foster homes. Jonah and Christina's son was placed in the custody of Jonah's parents.

9

{¶ 29} Jonah was diagnosed with autism when he was two years old. Jonah explained that he did what Christina told him to do because she was angry and threatened him. During the marriage, he did not get any sleep and did not eat properly, which affected his decision making. He was very depressed. Jonah stated that Christina claimed that he abused her and her children. She forced him to say things on video so that she could use it as blackmail against him. He was afraid that if he did not do what she said, then she would have him arrested. Even before the wedding, Jonah felt like he had nothing left because his money was gone, and he was under the impression that his family would not take him back. Because he believed that he had no other option, he married Christina.

{¶ 30} Jonah asked the court to find that Christina committed financial misconduct. He also asked the court to find that from an equitable standpoint, the marriage itself began in May 2021 when he moved in with Christina and her children.

### B. Klarissa Underwood's Testimony

{¶ 31} Klarissa Underwood testified on behalf of Christina. Underwood had known Christina since 2014, and they met when her oldest child went to preschool with Christina's oldest child. Underwood met Jonah when he and Christina first got together romantically. Underwood testified that on two occasions she was at Christina's home when both Jonah and Christina were present, and briefly on a third occasion during which she saw Jonah outside. The gatherings occurred prior to Christina and Jonah's marriage.

{¶ 32} According to Underwood, during one of the gatherings, she, Christina, and Jonah were in Christina's living room talking. Jonah stated he wanted to enter the marriage debt free and pay off the rest of what was owed on the 2020 Toyota Sienna. Jonah said he wanted to gift Christina the rest of the money to pay off the car. Jonah seemed very happy about the decision. Underwood denied that Christina threatened, coerced, or

10

applied any pressure to Jonah during the conversation. Underwood never saw Christina demand or request that the vehicle be paid off.

{¶ 33} Underwood testified that she saw Jonah and Christina after they were married on at least two occasions at birthday parties for Christina's children. According to Underwood, Jonah and Christina "kind of" appeared to be a normal married couple. She never saw Christina threaten or coerce Jonah to do anything.

### C. Christina's Testimony

{¶ 34} Christina testified that she met Jonah in person for the first time on April 1, 2021, which was her son's birthday. She and Jonah got married on July 7, 2021, in Dayton, Ohio. Jonah moved out of the marital home in January 2022. Christina had asked her friend to take Jonah to his parents' house, but he refused to go there, so her friend took him to a homeless shelter.

{¶ 35} Christina testified that she purchased her home on Mesmer Avenue with her grandmother in February 2012. Christina's grandmother quitclaimed the property to her in June 2017, and she refinanced the mortgage in July 2019. Jonah moved into the home with her and her children in May 2021. Jonah was never added to the deed or the mortgage for the Mesmer Avenue property. Jonah never made any mortgage payments for the property. Christina stated that she fell behind on the mortgage payments during her marriage. The principal balance of the mortgage on July 1, 2021, was $53,034.76, and the monthly mortgage payments were $271.40. As of April 18, 2022, the principal balance was down to $52,129.93. Christina claimed the house was valued at less than $60,000, but the auditor valued it at $62,000. Christina asked that she retain the property on Mesmer Avenue free and clear of Jonah and that she take full responsibility for the mortgage. At the time of trial, the mortgage payment remained $271.40 per month.

11

{¶ 36} During their relationship, Jonah owned a 2016 Chevrolet Cruz. Jonah traded in the Cruz and purchased a 2010 Honda Odyssey for $9,000. On February 7, 2022, Christina sold the Odyssey to her friend for $3,000. The estimated value of the vehicle on July 14, 2023, was $6,147, but Christina claimed it was a "lemon" and not worth that much.

{¶ 37} Christina purchased a 2020 Toyota Sienna in January 2020, financing the vehicle in the amount of $45,000 or $46,000. The title was in her name only and had not been in anyone else's name. She paid off the vehicle in full in June 2021 for $40,144.54 via a web payment directly from her personal Fifth Third Bank account. Christina agreed that the money used to pay off the Sienna could be traced to money that Jonah withdrew from his own accounts and placed into the joint bank account, which Christina then transferred to her own account. She and Jonah had discussed paying off the vehicle prior to their marriage. Jonah had quit his job, and Christina was concerned because he had no income. Jonah said not to worry about the bills because he had his 401(k)s to help pay off the vehicle. Jonah knew that all Christina's payments were automatically withdrawn through her personal checking account. The vehicle was paid off through an automatic payment through her checking account. Christina testified that she did not demand, request, threaten, or coerce Jonah to pay off the vehicle. She was very grateful and thanked him several times for doing it. There was no agreement that she would repay him. Christina did not understand why Jonah made any claim to the Sienna because she owned it prior to the marriage. Christina asked the court to acknowledge that the money to pay off the car was a gift.

{¶ 38} While the case was pending, Christina's attorney filed a motion on her behalf seeking permission to sell the Sienna. The motion advised the court that the Sienna was fully paid off, had belonged to Christina prior to the marriage, and was solely in her name.

12

The motion indicated that Christina was facing financial hardship because of losing custody of all her children. Although Christina knew that Jonah made a claim to the vehicle, the motion did not inform the court that Jonah had a claim because Christina did not believe she owed him any money and because she considered it premarital property. The trial court granted Christina's motion to sell the Sienna on October 3, 2024.

{¶ 39} The next day, Christina sold the Sienna for $28,500. From that money, Christina purchased a 2018 Chevrolet Equinox for $20,000. The remaining $8,500 was spent by October 8, 2024, paying off Christina's debts and purchasing necessities.

{¶ 40} According to Christina, the 2018 Chevrolet Equinox was a "lemon," and it was replaced with a 2022 Honda Pilot that Christina financed. At the time of trial, Christina had possession of the 2022 Honda Pilot and paid $708.00 per month.

{¶ 41} Christina did not have any investment or retirement accounts, and did not own any stocks, bonds, or business interests of any kind. Christina did not ask to have any retirement assets of Jonah's divided and stated he could keep them all.

{¶ 42} Christina did not work during the marriage and received SSI. Her five children also received SSI because they were disabled. She also received child support for two of her children. In total, she received about $5,600 a month, none of which was taxable. At the time of trial, only one of her six children lived with her. Christina received $870.30 in SSI per month for herself. Christina was not receiving SSI for the one child that lived with her because the child had lost SSI while she was in foster care. However, the child had been declared presumptively disabled because she was "so severe" that the government granted her temporary disability, so Christina expected to receive additional SSI soon.

{¶ 43} Although Jonah worked at Wright-Patterson Air Force Base prior to their marriage, Jonah did not work during the marriage or have any other source of income.

13

Jonah quit his job before they got married.   Before Jonah quit, Christina contacted her social security worker to discuss what effect, if any, Jonah's income level would have on her and her children's SSI.   Christina was concerned about health insurance and her children's disability needs.   She asked Jonah not to quit until she had talked to the social worker, but he quit anyway stating that he wanted to be a stay-at-home dad.   Christina denied telling Jonah to quit.

{¶ 44} Christina and Jonah had a joint Fifth Third Bank account that was opened in May 2021 and closed in August 2021.   There was no money in the joint account when they were married.   According to Christina, because the joint account was overdrawn, the bank pulled money from Christina's personal checking account, so the joint account was then closed.   Between May and August 2021, Christina transferred $88,201.91 from the joint account into her personal bank account.   Christina did not seek an award for any money from Jonah's personal bank accounts.

{¶ 45} Christina testified she had two bank accounts in her name: one through Fifth Third Bank and one through Chase Bank.   Christina opened the Chase Bank account just before she got married.   It had about $25-50 in it.   Jonah's name was never on the account, and he did not have access to the account.   During cross-examination, Christina stated she did not disclose the Chase Bank account during discovery because she must have forgotten about it since she never used it.   She testified on redirect that it was possible she opened the Chase Bank account after she responded to the interrogatories.

{¶ 46} Christina testified that she had about $100 or less in her personal Fifth Third Bank account at the time of trial.   She had had that account in her name for several years prior to meeting Jonah.   She believed she had about $100 in her account at the time she and Jonah got married.   Between May 20, 2021, and June 18, 2021, Christina deposited

14

$107,106.83 into her personal account. During that same time frame, Christina withdrew $100,690.68. Christina testified that all the bills were paid directly out of her personal account, which is why she and Jonah agreed to put all the money into her account. She denied making any large purchases that she kept for herself and did not disclose. Although Christina acknowledged that she had had sole control over the money she moved from the joint account into her personal account, she claimed she had consulted Jonah about making the financial decisions. Christina asserted that Jonah knew everything she did, and they had agreed to all of it.

{¶ 47} During trial, Christina disclosed that she had additional accounts in her children's names for their social security benefits. None of these accounts were disclosed prior to trial because Christina stated they were not her own accounts. According to Christina, the only deposits that went into those accounts were the children's SSI checks. Because the children received SSI, the accounts could hold only up to $2,000 per account at a time. Christina denied transferring any money to those accounts. However, on June 1, 2021, Christina transferred $1,999.99 to each of the bank accounts in her children's names from her personal Fifth Third Bank account.

{¶ 48} Christina had a lot of debt in her own name, which included her mortgage, credit card debts, loans, and a vehicle note. She did not ask the court for Jonah to be responsible for any of her own debts.

{¶ 49} Christina acknowledged that she should be partially responsible for the marital debt, which included the Walmart credit card, Kohl's credit card, Fetch account, and Jared's debt. The three sheds and two carports from Walmart were purchased for Christina's property. The Kohl's debt was for the purchase of coats for Christina's children and the child of one of Christina's friends. The dog was purchased for Christina's oldest daughter.

15

Christina kept the dog when Jonah moved to the homeless shelter but claimed the dog died the day after Jonah left. The Jared's debt was for two cross necklaces that were for Christina and her friend Linda. Christina still had the cross pendant, but the chain had broken. Christina claimed she did not know exactly where the cross was located because she had "moved twice" since she received it.

{¶ 50} Christina testified that she married Jonah because she loved him and she wanted them to have a life and family together. Christina could not conceive naturally, which is why she used IVF. According to Christina, there were three different payments made to the fertility clinic that accounted for much of the money that was spent from the joint account.

{¶ 51} On December 28, 2021, Christina filed for an annulment. Christina claimed that she had sought the annulment because Jonah was abusive to her and her children. She failed to disclose at the time she filed that she was pregnant with Jonah's son. She blamed this failure on her attorney. The annulment was denied, but Jonah had filed for divorce. Christina believed that they were incompatible and asked the court to terminate her marriage. According to Christina, she lost everything and had to try to rebuild her life due to Jonah's lies. Christina stated that Jonah helped her a lot prior to the marriage, but the money he gave her was a gift. Christina stated that all personal property had been divided amongst them by the time of trial.

{¶ 52} After Jonah left the home, Children Services became involved and removed all six children from Christina's custody. At the time of trial, Christina's eldest daughter had been returned to her and lived with her. Christina voluntarily surrendered permanent custody of two of her children. Two other children were in the custody of their biological father. Jonah and Christina's son was in the custody of Jonah's parents.

16

### D. Trial Court's Decision

{¶ 53} On March 21, 2025, the trial court issued a decision granting Jonah a divorce "on the grounds of financial misconduct" and finding that Christina had committed financial misconduct. Christina was ordered to pay Jonah a distributive award of $58,827.40 due to Christina's financial misconduct. Christina was held responsible for the majority of the marital debt, which included $4,000 for the dog debt, the Kohl's debt, the Walmart debt, and part of the Jared's debt. Finally, the court awarded Jonah $3,000 in attorney's fees because Jonah requested a continuance only once in the matter. The trial court further ordered Christina to pay the first $500 of the court costs, with the remaining court costs split evenly between the parties. The court ordered Jonah's attorney to prepare the final judgment and decree of divorce and to incorporate all matters to which the parties stipulated and the decision of the trial court.

{¶ 54} Christina appealed from the trial court's March 21, 2025 decision. The appeal was dismissed for lack of a final, appealable order. A final judgment and decree of divorce was filed on May 7, 2025, incorporating the matters decided in the court's March 21, 2025 decision. Christina timely appealed.

### II. Attorney's Fees

{¶ 55} In her first assignment of error, Christina contends that the trial court abused its discretion when it awarded attorney's fees of $3,000 to Jonah. Christina argues that there was no evidence presented at trial related to attorney's fees and the trial court's justification for awarding attorney's fees was unreasonable. Jonah responds that the trial court reasonably imposed attorney's fees based on the totality of the circumstances presented during the trial. Jonah primarily relies on Christina's malfeasances during the marriage rather than any actions that occurred during the course of the divorce proceedings.

17

**{¶ 56}** "Ohio courts generally follow the 'American rule' with respect to attorney fees: each party is responsible for its own attorney fees." *Phoenix Lighting Group, L.L.C. v. Genlyte Thomas Group, L.L.C.*, 2020-Ohio-1056, ¶ 9, citing *Wilborn v. Bank One Corp.*, 2009-Ohio-306, ¶ 7. An exception to this general rule applies when a statute specifically authorizes it. *Wilborn* at ¶ 7. In divorce actions, R.C. 3105.73(A) provides that a trial court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable. When determining whether the grant of attorney's fees is equitable, a trial court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate. R.C. 3105.73(A).

**{¶ 57}** "The decision to award attorney's fees rests in the sound discretion of the trial court and will not be overturned on appeal absent an abuse of that discretion." *Gore v. Gore*, 2010-Ohio-3906, ¶ 34 (2d Dist.), citing *Layne v. Layne*, 83 Ohio App.3d 559, 568 (2d Dist. 1992). "A trial court abuses its discretion when it acts in an unreasonable, arbitrary or unconscionable manner." *State v. Finnerty*, 45 Ohio St.3d 104, 107 (1989). "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id*.

**{¶ 58}** Generally, in order to recover attorney's fees in a divorce proceeding, the party requesting attorney's fees has the burden to prove that expenses were incurred and that they were reasonable and necessary. *Norbut v. Norbut*, 2003-Ohio-1380, ¶ 36 (2d Dist.).

18

Thus, the burden was on Jonah to demonstrate that he incurred legal expenses and that the expenses were reasonable and necessary.

{¶ 59} In this case, there was no testimony or other evidence presented at the final divorce hearing regarding any attorney's fees or litigation expenses incurred by Jonah. Nor was there a specific amount requested by Jonah for attorney's fees. Nevertheless, Jonah argues that this court has recognized limited circumstances in which a court is permitted to use its own knowledge in determining the reasonableness and necessity of nominal attorney's fees. Appellee's Brief, p. 12. Jonah contends that the nominal attorney's fees in this case were reasonable and necessary based on the record. Jonah further argues that Mont. D.R. Rule 1.14(A) provides that a minimum award of $1,000.00 in divorce cases is prima facie reasonable. Therefore, because the trial court had discretion to award more, and Christina produced no evidence that Jonah should not be entitled to the award, it was not an abuse of discretion to award $3,000.00 in attorney's fees. Appellee's Brief, p. 14-15. We disagree.

{¶ 60} The trial court provided the following rationale for awarding Jonah attorney's fees:

> Further, as Jonah only requested a continuance once in this matter (Joint Motion, filed October 17, 2022) the Court orders that Chistina be responsible for $3,000.00 in his Attorney's fees (due to Defendant within sixty (60) days of issuance of this decision), and the first $500.00 in court costs beyond the deposit.

Decision (Mar. 21, 2025), p. 16.

{¶ 61} It appears that the court based the attorney's fees on the conduct of the parties during the course of the proceedings. "[W]hen an award of attorneys' fees is based on the

19

conduct of a party, the record must reasonably demonstrate some nexus between the amount of fees awarded pursuant to R.C. 3105.73(A) and the particular conduct for which the award is made." *Feldmiller v. Feldmiller*, 2012-Ohio-4621, ¶ 73 (2d Dist.), citing *Janis v. Janis*, 2011-Ohio-3731 (2d Dist.). Though R.C. 3105.73(A) may not obligate a party to link every specific act of the opposing party to an amount of attorney's fees, "the evidence as a whole still must tend to support a particular attorney-fee award." *Doss v. Doss*, 2024-Ohio-2730, ¶ 29 (2d Dist.). "Otherwise, the award is not supported by a sound reasoning process." *Id*.

{¶ 62} In addition to the joint continuance filed on October 17, 2022, the parties had filed a joint continuance on August 2, 2022; both of which were granted. The record does not reflect that Christina's conduct unreasonably delayed the litigation of the case or intentionally frustrated the proceedings. Christina filed five motions requesting to continue various hearings; three of which were granted and two denied. Christina filed two motions in early December 2022 to continue a December 7, 2022 hearing, both on the basis that the wife of Christina's counsel had unexpectedly gone into labor early and that counsel was therefore unavailable for the scheduled hearing. Those motions, which had nothing to do with Christina, were granted. Christina filed another motion to continue on July 24, 2023, citing her counsel's participation in a criminal felony trial that was going to take longer than expected. That motion, which likewise had nothing to do with Christina, was granted. On February 24, 2025, Christina filed a motion to continue the March 6, 2025 final divorce hearing because she was scheduled to undergo a medical procedure on February 27, 2025. This motion was denied, along with a second motion for a continuance filed on March 5, 2025, which cited the negative effects of Christina's February surgery. Moreover, although Christina filed motions seeking relief from the court's temporary mutual restraining order

20

seeking permission to sell certain property, none of those motions delayed the proceedings. Accordingly, the record does not support the trial court's particular attorney-fee award.

{¶ 63} Jonah also cites Mont. D.R. Rule 1.14(A). That rule, however, was not in effect until November 12, 2025. At the time of the hearing, former Mont. D.R. Rule 4.27 applied to the award of attorney's fees in divorce proceedings. Relevant here, former Mont. D.R. Rule 4.27(A) provided that the trial court had discretion to award reasonable attorney's fees if the court determined that a party would be prevented from fully litigating their rights and adequately protecting their interests, and that the award was equitable. Absent evidence to the contrary, a prima facie reasonable attorney fee under former Mont. D.R. Rule 4.27(F) was "up to $500.00 per hearing conducted or prepared for, in modification and enforcement proceedings; and up to $1,000.00 in divorce, legal separation, annulment, appeal, and custody proceedings." Former Mont. D.R. Rule 4.27(G)(1) further provided that if a party requested attorney's fees exceeding the prima facie reasonable fee amount set forth in section (F) of the rule, a hearing was required to be held on the fee request at which certain requirements had to be met.

{¶ 64} The trial court ordered Christina to pay $3,000.00 in attorney's fees. No fee hearing was requested, and no evidence was presented to the court that Jonah incurred any attorney's fees or that the fees were reasonable and necessary. "This court has only upheld attorney fee awards without evidence of reasonableness where the fee was nominal and appeared manifestly reasonable from the record." *White v. White*, 2016-Ohio-7628, ¶ 21 (2d Dist.). Awarding $3,000.00 is not nominal and clearly exceeds the prima facie reasonable amounts provided for in the local rules.

{¶ 65} Lastly, Jonah argues that the award of attorney's fees was reasonable due to Christina's financial misconduct. While we agree that there was ample evidence of

21

Christina's financial misconduct as more fully explained below, that was not the stated justification for the trial court's decision to award attorney's fees. Rather, the trial court indicated that it awarded attorney's fees on the ground that Jonah "only requested a continuance once in this matter." The trial court's rationale was contradicted by the record, and no sound reasoning process supports the award of attorney fees based on the trial court's given reasoning. Accordingly, we conclude that the trial court abused its discretion in ordering Christina to pay $3,000.00 to Jonah for attorney's fees.

{¶ 66} Christina's first assignment of error is sustained.

### III.    Grounds for Divorce

{¶ 67} In her second assignment of error, Christina argues that the trial court erred in granting a divorce on grounds of financial misconduct, as that is not a proper ground for divorce in Ohio. Christina asks that the trial court's decision be remanded to the trial court to establish a legally sufficient ground for divorce. Jonah responds that the evidence and testimony at trial support a divorce on the ground of incompatibility.

{¶ 68} A common pleas court may grant a divorce for one of several causes, including incompatibility, unless denied by either party. R.C. 3105.01(K). "'Incompatibility, under R.C. 3105.01(K), is really not a "ground" that has to be proven so much as a status that must be agreed on by both parties; it is a consensual ground that is not intended to be litigated.'" *Rodgers v. Henninger Rodgers*, 2003-Ohio-2642, ¶ 12 (5th Dist.), quoting *Lehman v. Lehman*, 72 Ohio App.3d 68, 71 (4th Dist. 1991). A trial court has broad discretion in determining the proper grounds for divorce and its decision will not be reversed, absent an abuse of discretion. *Botello v. Gonzalez*, 2025-Ohio-1390, ¶ 35 (2d Dist.), citing *Tedrow v. Tedrow*, 2003-Ohio-3693, ¶ 23 (11th Dist.).

22

{¶ 69} The final judgment and decree of divorce stated that Jonah was entitled to a divorce from Christina but did not identify the specific grounds for divorce. In its decision rendered on March 21, 2025, which was fully incorporated into the final judgment and decree of divorce, the trial court stated that Jonah was granted a divorce on the grounds of financial misconduct. Financial misconduct is not one of the permitted statutory grounds for divorce. Therefore, the trial court erred in granting a divorce on this basis. But the error was harmless because the record establishes that a divorce was warranted on the statutory grounds of incompatibility. *Alselaim v. Ahreshien*, 2023-Ohio-2420, ¶ 72 (6th Dist.).

{¶ 70} The trial court's analysis regarding the grounds for divorce contemplated incompatibility and cited to R.C. 3105.01(K). Jonah's testimony made clear that the parties were incompatible and requested the court to grant a divorce. Christina likewise requested a divorce and explicitly testified that the parties were incompatible. Because the record establishes that the parties were incompatible, and neither party denied their incompatibility, there were sufficient grounds for divorce pursuant to R.C. 3105.01(K). *Mathewson v. Mathewson*, 2007-Ohio-574, ¶ 8-10 (2d Dist.).

{¶ 71} Christina's second assignment of error is overruled.

## IV. Division of Assets and Liabilities

{¶ 72} In her third assignment of error, Christina argues that the trial court erred in awarding Jonah $58,827.40 related to financial transactions that occurred prior to the parties' July 7, 2021 marriage. Christina does not dispute the amounts but rather argues that they were not marital property because the financial transactions did not occur during the marriage. In her fourth assignment of error, Christina challenges the trial court's finding of financial misconduct. In the fifth assignment of error, Christina argues the trial court erred

23

in effectively assigning her all of the marital debt. Because each of these assignments of error relate to the trial court's division of assets and liabilities, we address them together.

## A. Distributive Award

**{¶ 73}** In divorce proceedings, the trial court is required to determine what constitutes marital property and what constitutes separate property. R.C. 3105.171(B). Upon making such determinations, the trial court must divide the marital and separate property equitably between the spouses, in accordance with R.C. 3105.171. *Id*.

**{¶ 74}** "Marital property" includes, in relevant part:

(i) All real and personal property that currently is owned by either or both of the spouses, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;

(ii) All interest that either or both of the spouses currently has in any real or personal property, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;

(iii) Except as otherwise provided in this section, all income and appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage;

R.C. 3105.171(A)(3)(a)(i) through (iii).

**{¶ 75}** Marital property excludes any separate property of the parties. R.C. 3105.171(A)(3)(b). "Separate property" is defined, in relevant part, as all real and personal property and any interest in real or personal property that the court finds was acquired by one spouse prior to the date of the marriage. R.C. 3105.171(A)(6)(a)(ii).

24

Where parties have commingled separate property with other property, the commingling "does not destroy the identity of the separate property as separate property, except when the separate property is not traceable." R.C. 3105.171(A)(6)(b).

{¶ 76} To determine marital property, the trial court must initially identify the duration of the marriage. There is a statutory presumption that the duration of a marriage runs from the date of the marriage through the date of the final divorce hearing. R.C. 3105.171(A)(2)(a). "However, R.C. 3105.171(A)(2)(b) permits the trial court to use other dates in determining what is marital property and in dividing that property if it finds that the use of the date of marriage or the date of the final hearing is inequitable." *Lark v. Lark*, 1999 WL 1043898, *1 (2d Dist. Nov. 19, 1999). Determinations regarding the duration of the marriage for the purposes of property distribution are reviewed under an abuse of discretion standard. *Taylor v. Taylor*, 2013-Ohio-2341, ¶ 48 (2d Dist.).

{¶ 77} Jonah asked the trial court to find, from an equitable standpoint, that the marriage began when he started living with Christina in May 2021. When the trial court calculated the division of the parties' assets and liabilities, the trial court's equitable determination started when the parties "began living together sometime in May [2021]," and ended when Jonah was expelled from the home in January 2022. Decision (Mar. 21, 2025), p. 15. The decision clearly used those dates as the relevant time frame the court considered "during the marriage" for determining the parties' obligations to each other. Both the record and the trial court's findings support that the duration of the marriage was from May 2021 until January 2022.

{¶ 78} Jonah and Christina both testified that Jonah moved in with Christina and her five children in May 2021. On May 22, 2021, they created a joint bank account with the intention of using the joint account during the marriage. The joint bank account records

25

reflected that Jonah and Christina were living in Christina's house at that time. In May and June 2021, Jonah transferred nearly all of his separate pre-marital money from his TSP account (total of $35,441.00), WPCU account (total of $13,350.00), and Vanguard account (total of $22,036.40) into the joint account for the benefit of the marriage at Christina's request. Jonah's final paychecks were deposited into the joint account, and his own personal bank account was emptied and closed as of May 24, 2021.

{¶ 79} Although Jonah was employed full-time prior to the marriage, he quit working in June 2021 at Christina's behest. Unbeknownst to Jonah at the time, the entirety of the joint account funded by Jonah's pre-marital property was transferred to Christina's personal account by Christina prior to their July 7, 2021 marriage ceremony. Because Christina moved every last penny out of the joint account to her personal account, to which Jonah had no access, Jonah was financially dependent on Christina before July 7, 2021. Christina further exerted her control over Jonah by getting him to dispose of his car and purchase a van to transport her children and alienated Jonah from his family so that he was entirely reliant on her. Jonah testified that he married Christina in July because he had nothing left, felt threatened by Christina, and was under the impression, because of Christina, that his family would not take him back.

{¶ 80} The marriage itself was contrived out of Christina's desire to have another child. She duped Jonah into agreeing to IVF by asserting that her doctor advised her that in one year's time, she would be unable to bear any more children for medical reasons. Once Jonah agreed to go through IVF, Jonah was convinced by Christina that they had to get married because her IVF doctor required them to be married to pursue IVF. Based on Christina's deceit, they initiated IVF treatments in May 2021 in anticipation of the marriage.

26

**{¶ 81}** By May 2021, the parties cohabited, were financially entangled, and had initiated IVF treatments to start a family. Based on these facts, we cannot conclude that the trial court abused its discretion in setting May 2021 as the de facto marriage date.

**{¶ 82}** "The analysis in determining a 'de facto' termination date for a marriage is, essentially, factual, and includes: (1) whether the parties separated; (2) whether they made an attempt at reconciliation; (3) whether they continually maintained separate residences; and, (4) whether they maintained separate business or financial arrangements." *Nitschke v. Nitschke*, 2007-Ohio-1550, ¶ 26 (11th Dist.), citing *Marini v. Marini*, 2006-Ohio-3775, ¶ 13 (11th Dist.). In this case, the parties' only joint account was closed in August 2021 and neither party was working. Christina obtained counsel and filed for an annulment on December 28, 2021. On January 14, 2022, Jonah was asked to leave the marital home, at which point he went to a homeless shelter. Thus, as of January 2022, the parties no longer cohabited, shared finances, or attempted to reconcile. We cannot conclude that the trial court abused its discretion in setting January 2022 as the de facto termination of marriage date.

### B. Financial Misconduct and Distributive Award

**{¶ 83}** We now consider whether the trial court erred in awarding Jonah a distributive award of $58,827.40. To do so, we must first consider the trial court's finding of financial misconduct.

**{¶ 84}** In addition to dividing the marital and separate property equitably between the spouses, the court may make a distributive award. A distributive award is "any payment or payments, in real or personal property, that are payable in a lump sum or over time, in fixed amounts, that are made from separate property or income, and that are not made from marital property and do not constitute payments of spousal support, as defined in section

27

3105.18 of the Revised Code." R.C. 3105.171(A)(1). A distributive award is "'an award from separate property made in order to achieve equity, (1) to compensate a party for the financial misconduct of the other party; (2) to provide relief where it is impractical or burdensome to reach an equitable division comprised of marital property alone; or (3) to effectuate, facilitate, or supplement the disbursement of marital property.'" *Klein v. Cruden*, 2004-Ohio-1479, ¶ 15 (2d Dist.), quoting Sowald & Morganstern, *Domestic Relations Law* § 12:5, at 578-579 (4th Ed. 2002).

{¶ 85} A trial court may make a distributive award under its general equitable powers pursuant to R.C. 3105.171(E)(1) and R.C. 3105.171(F). *Devito v. Devito*, 2024-Ohio-2234, ¶ 18-19 (1st Dist.). A distributive award is also proper if a spouse has engaged in financial misconduct. R.C. 3105.171(E)(4). The term "financial misconduct" includes, but is not limited to, "the dissipation, destruction, concealment, nondisclosure, or fraudulent disposition of assets." *Id*. "[T]he required misconduct must portray a form of wrongdoing undertaken for the purpose of profiting the offending spouse and/or defeating the other spouse's share of marital assets." *Feldmiller*, 2012-Ohio-4621, at ¶ 22 (2d Dist.).

{¶ 86} "Because financial misconduct involves some element of profit or interference with another's property rights, the time frame in which the alleged misconduct occurs may often demonstrate wrongful scienter." *Hammond v. Brown*, 1995 WL 546903, *3 (8th Dist. Sept. 14, 1995). "[I]f the time frame of the alleged misconduct does not establish [wrongful] scienter, there must be some other evidence that does establish it." *Orwick v. Orwick*, 2005-Ohio-5055, ¶ 28 (7th Dist.). The burden of proving financial misconduct rests with the complaining spouse. *Kowalkowski-Tippett* v. *Tippett*, 2021-Ohio-4220, ¶ 15 (10th Dist.).

{¶ 87} "An appellate court will not reverse a trial court's determination regarding financial misconduct unless it is against the manifest weight of the evidence." *Id*. at ¶ 16,

28

citing *Best v. Best*, 2011-Ohio-6668, ¶ 18 (10th Dist.). On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.

{¶ 88} Christina argues that the trial court's determination regarding financial misconduct is against the manifest weight of the evidence for two reasons. First, she argues that the reason for the distributive award, her financial misconduct, related to separate pre-marital property, which is outside the scope of R.C. 3105.171(E)(4). Second, Christina claims that the evidence does not support a finding of financial misconduct because Jonah voluntarily liquidated his financial assets and provided Christina access to all his funds. We disagree.

{¶ 89} The distributive award was not outside the scope of R.C. 3105.171(E)(4) because the duration of the marriage included all of Christina's financial malfeasance from May 2021 through January 2022. Further, the trial court found Jonah's testimony credible and Christina's testimony not credible. The trial court observed that the more Christina testified, "the more she revealed her manipulation over accounts, over information, and over Jonah." Decision (Mar. 21, 2025), p. 11. When an appellate court reviews a trial court's judgment, it must generally defer to the fact-finder's weight of the evidence and credibility determinations. *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 81 (1984).

{¶ 90} In determining that Christina engaged in financial misconduct during the marriage, the court found that Christina made all the critical and unilateral decisions concerning the parties' finances. Although Jonah voluntarily liquidated his assets and

29

placed them into the joint account, he was not aware that Christina moved everything from the joint account to her own personal account until it was too late.

{¶ 91} Jonah's TSP account (total of $35,441.00), WPCU account (total of $13,350.00), and Vanguard account (total of $22,036.40) would normally have been considered separate pre-marital property as they were attained by Jonah prior to May 2021. *See* R.C. 3105.171(A)(6)(a) ("Any real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage."). Unfortunately, Jonah could not be awarded any of that property because Christina, during the marriage, intentionally defeated Jonah's interest in these assets by unilaterally spending all of the funds transferred from his accounts.

{¶ 92} "The commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable." R.C. 3105.171(A)(6)(b). "Property is commingled when it is put together with other property into a common fund or item." *Fisher v. Fisher*, 2004-Ohio-7255, ¶ 7 (2d Dist.). "Traceable" in the context of divorce proceedings, "refers to evidence demonstrating a connection between property currently owned and some antecedent article of separate property." *Maloney v. Maloney*, 2005-Ohio-1368, ¶ 22 (2d Dist.).

{¶ 93} The record reflects that between May 22, 2021, and June 17, 2021, the parties made 14 deposits into their joint account totaling $92,942.07, which included the transfer of Jonah's TSP account (total of $35,441.00), WPCU account (total of $13,350.00), and Vanguard account (total of $22,036.40), as well as Jonah's salary and other financial assets. Of the total deposits made, only $115 was transferred from Christina's account. Meanwhile, 19 withdrawals totaling $92,942.07 were made from the joint account. Of those

withdrawals, $81,887.99 was directly transferred to Christina's personal account. Additionally, $10,280.00 was drawn from the joint account for two cashier's checks (with additional $8.00 fees per check) for unknown reasons.

{¶ 94} On May 20, 2021, Christina's personal account had a balance of $1,616.47. Between May 20, 2021, and June 18, 2021, Christina deposited a total of $107,106.83 into her personal account. She withdrew $100,690.68 during that same time frame. As quickly as Jonah deposited his money into the joint account, Christina transferred it to her joint account where Jonah had no access to it; often transferring the money the same day it was deposited. On June 8, 2021, Christina made a payment of $40,144.54 to pay off her 2020 Toyota Sienna. Notably, on June 1, 2021, Christina transferred $1,999.99 to each of her five children's SSI savings accounts. She explained that the SSI accounts were limited to $2,000.00 and that any amount over that threshold would have been removed by social security. Christina did not disclose any of her children's SSI accounts prior to trial. She also did not disclose that she had a separate Chase account prior to trial.

{¶ 95} Between June 18, 2021, and July 16, 2021, three deposits were made into the joint account totaling $6,160.12. With the exception of an uncategorized $1,000 deposit, the remaining deposits were from Jonah's last paychecks. Upon depositing the moneys to the joint account, they were immediately transferred to Christina's personal account.

{¶ 96} Between July 17, 2021, and August 17, 2021, two deposits were made on behalf of Jonah totaling $172.69. The same day these deposits were made, they were transferred to Christina's account. Despite Christina's allegation that the joint account was overdrawn in August 2021, there is no evidence of that in the records. Nevertheless, the joint account was closed in August 2021.

{¶ 97} The majority of Jonah's separate pre-marital assets were commingled with Christina's when she independently transferred all of it to her personal account. Although $40,144.54 of Jonah's separate pre-marital property was directly traceable to the payoff of the 2020 Toyota Sienna, Christina sold the vehicle during the divorce proceedings. On October 1, 2024, Christina filed a motion seeking relief from the court's temporary mutual restraining order for permission to sell the "pre-marital" 2020 Toyota Sienna due to financial hardship. The motion stated that the vehicle was purchased by Christina before the marriage, was titled solely in Christina's name, and was completely paid off prior to the parties' marriage. The motion did not indicate that the vehicle was entirely paid off using Jonah's pre-marital assets or that the assets used to purchase the vehicle were under direct dispute in the divorce action.

{¶ 98} Christina's motion was granted on October 3, 2024, and she sold the 2020 Toyota Sienna on October 4, 2024. The vehicle had been valued by Blue Book in July 2023 at $40,029, yet she sold it for $28,500. Christina used $20,000 of the proceeds to purchase a 2018 Chevrolet Equinox and within four days spent the remaining $8,500 to pay off her own debts. She did not make any payments on the marital debts or give Jonah any of the proceeds. Christina then exchanged the 2018 Chevrolet Equinox, which she described as a "lemon," for a 2022 Honda Pilot. A portion of the money earned from the exchange of the 2018 Chevrolet Equinox went toward the 2022 Honda Pilot, while the rest of it went toward Christina's debts. Tr. 131. At the time of the March 6, 2025 final divorce hearing, Christina still had the 2022 Honda Pilot, but she had financed its purchase and still owed money on it.

{¶ 99} After Christina spent down all of Jonah's money, she used him to incur new debt in his name only, despite Christina knowing that Jonah did not have any income or any

32

separate remaining savings.   Christina was supposed to be responsible for paying the day-to-day expenses, yet she did not pay off any of the marital debt incurred.   All the marital debt, which is more fully discussed below, accumulated in September 2021, after the joint account had been closed in August 2021.   Christina then filed for an annulment on December 28, 2021.

**{¶ 100}** The trial court found that Christina had withheld pertinent information from the court when filing documents and had failed to disclose bank accounts prior to trial. When Christina filed for an annulment, she failed to disclose that she was pregnant.   When Christina filed a motion to sell the 2020 Toyota Sienna, she failed to disclose that it was purchased with Jonah's pre-marital money or that the assets used to purchase the vehicle were under direct dispute in the divorce action.   During Christina's testimony, it was discovered that she had failed to disclose a Chase Bank account and her five children's bank accounts.   R.C. 3105.171(E)(3) imposes a duty upon the parties to a divorce "to disclose in a full and complete manner all marital property, separate property, and other assets, debts, income, and expenses of the spouse."   Christina initially testified that the Chase Bank account was opened "right before the marriage" in only her name.   Tr. 86. She claimed she did not disclose it in discovery because she "forgot" about it.   She then claimed on redirect that it was possible the account was opened after she had responded to the interrogatories in March 2022.   Christina also claimed she did not disclose her children's bank accounts because they were not her personal accounts.   She denied transferring any of Jonah's money to her children's savings accounts because they were designed to deposit only the children's SSI checks into and they could not hold more than $2,000 at a time. However, Christina's personal bank records reflect that Christina moved $1,999.99 into each of her five children's bank accounts in June 2021, after Christina transferred Jonah's money

33

to her personal account.   It is not surprising that the trial court found Christina not credible.   Christina was deceitful during her testimony regarding the parties' finances.   Christina testified that the parties' joint account was overdrawn in August 2021, which resulted in the account being closed.   The joint bank account records do not reflect any overdrawn balance.   Christina testified that during the marriage she did not make regular monthly mortgage payments and "fell behind."   Tr. 106.   Though Christina did not make regular monthly mortgage payments in January, March, or April 2021, Christina made all the monthly mortgage payments between May 2021 and February 2022.   Def. Ex. K1.

{¶ 101} The record reflects that Christina spent down all of Jonah's pre-marital assets and incurred marital debt in his name, all of which benefited Christina, before filing for an annulment and sending Jonah to a homeless shelter.   As the trial court aptly stated, "[T]he fact that a household living off of $5,600.00 in government benefits per month was able to dispose of $100,000.00 in a month is unfathomable . . . ."   Decision (Mar. 21, 2025), p. 11.   When Christina no longer had any use for Jonah or his money, she filed for an annulment.   Even after Jonah was forced from the marital home, Christina kept Jonah's 2010 Honda Odyssey and sold it to her friend for $3,000.   Despite the 2010 Honda Odyssey belonging to Jonah, Christina did not use the proceeds of the sale to pay off any marital debt or share the proceeds with Jonah.

{¶ 102} The record is replete with evidence of Christina engaging in a scheme to take and spend Jonah's money at breakneck speed.   She did so without remorse or hesitation.   She coopted Jonah's money for her selfish desires and her individual debts rather than to pay for marital expenses.   Christina's actions fraudulently disposed of Jonah's assets, and she personally profited through her actions while rendering Jonah broke and temporarily homeless.   Under these facts, we cannot conclude that the trial court clearly lost its way in

34

finding that Christina engaged in financial misconduct or that its decision created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

{¶ 103} Having found that Christina engaged in financial misconduct, the trial court was authorized to compensate Jonah with a distributive award or with a greater award of marital property.   The trial court found that Jonah was entitled to a lump-sum distributive award in the amount of his squandered separate pre-marital property (Jonah's TSP account, WPCU account, and Vanguard account totaling $70,827.40), minus reasonable living expenses Jonah would have expended had he not been living with Christina during the length of the marriage ($1,500 for 8 months for a total of $12,000).   The trial court explicitly noted that Christina retained ownership of the marital home and the 2022 Honda Pilot. Therefore, the trial court ordered Christina's attorney to advise Christina to refinance her property or turn in her vehicle to facilitate her repayment of Jonah.

{¶ 104} The domestic relations court's review of the evidence was thorough, and our own review of the evidence fails to reveal any abuse of discretion on the part of the trial court in awarding Jonah a distributive award in the amount of $58,827.40 as a result of Christina's financial misconduct that occurred during the marriage.

{¶ 105} Christina's third and fourth assignments of error are overruled.

### C.  Marital Debt

{¶ 106} "Debts, like assets, are classified as property, and an order assigning either to one of the parties is a form of property division."   *Stackhouse v. Stackhouse*, 1997 WL 451471, *2 (2d Dist. July 25, 1997).   "When dividing marital property, the court begins with an equal division, but it may divide the property unequally if it concludes that an equal division would be inequitable."   *Pruitt v. Pruitt*, 2022-Ohio-2058, ¶ 23 (2d Dist.), citing *Ulliman v. Ulliman*, 2008-Ohio-3876, ¶ 28 (2d Dist.), citing R.C. 3105.171(C)(1).

35

{¶ 107} "'Marital debt has been defined as any debt incurred during the marriage for the joint benefit of the parties or for a valid marital purpose.'" *Paterchak v. Paterchak*, 2013-Ohio-3043, ¶ 19 (2d Dist.), quoting *Lucas v. Lucas*, 2011-Ohio-6411, ¶ 33 (7th Dist.), citing *Ketchum v. Ketchum*, 2003-Ohio-2559, ¶ 47 (7th Dist.). "Like assets, debts accumulated during the marriage are generally presumed to be marital unless it can be proved they are separate." *Hall v. Bricker*, 2024-Ohio-1339, ¶ 110 (10th Dist.). When a debt is incurred during marriage, the burden is on the spouse seeking to have the debt classified as separate debt to demonstrate by a preponderance of the evidence that the debt was the separate obligation of the other spouse. *Pruitt* at ¶ 22. "In reviewing the equity of a division of property, one of the basic guidelines an appellate court is bound to follow is that the trial court's judgment cannot be disturbed on appeal absent a showing that the common pleas court abused its discretion in formulating its division of the marital assets and liabilities of the parties." *Martin v. Martin*, 18 Ohio St.3d 292, 294-295 (1985), citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 218 (1983), *Koegel v. Koegel*, 69 Ohio St.2d 355, 357, *Berish v. Berish*, 69 Ohio St.2d 318, 319 (1982), and *Cherry v. Cherry*, 66 Ohio St.2d 348, 355 (1981).

{¶ 108} The total marital debt consisted of the credit card balances on accounts with Kohl's, Walmart, and Jared's, as well as the money Jonah borrowed to purchase the dog, which totaled $10,613.67. The trial court acknowledged that while debts of the marriage are generally split equally, in this case, an equal split was inequitable based on Christina's financial misconduct. Therefore, the trial court ordered that Christina be responsible for $1,216.39 of the Kohl's account; $3,033.04 of the Walmart account; $4,000 for the dog purchased from Fetch; and $1,614.24 of the Jared's account. Christina does not contest

36

the amounts of the debts or their classification as marital debts; rather she argues that the debts should have been divided equally. We disagree.

{¶ 109} In June 2021, Jonah took out a credit line from Kohl's. Some purchases were made in June 2021 but were paid off. The card was not used again until September 2021, when Jonah used his Kohl's credit card to buy coats for Christina's children and the child of one of Christina's friends in the amount of $799.43. No further purchases were made using the credit card, but due to late fees and interest, the total owed on the account was $1,216.39.

{¶ 110} In September 2021, Jonah took out a credit line from Walmart at Christina's request. On September 18, 2021, Jonah purchased two carports and three sheds for Christina's backyard in the amount of $2,490.41. After Jonah put up the carports, Christina had him tear them down and put them by the side of the road to be hauled away. Jonah did not know what happened to the sheds, but he did not take them with him when he left Christina's home in January 2022. No other purchases or payments were made on the Walmart credit card. The total balance owed, after late fees and interest, was $3,033.04.

{¶ 111} In September 2021, Jonah took out a credit line from Jared's at Christina's request. On September 13, 2021, Jonah made a purchase of $1,921.48 on Christina's behalf. Jonah testified that the purchase was for necklaces for Christina's friend and her friend's daughter. Christina testified that the purchase was for matching necklaces for herself and her friend. Christina claimed that her necklace had broken and she still had the pendant, but she did not know where it was because she had "moved twice since then." There is no evidence in the record that Christina lived anywhere other than the Mesmer Avenue address. No other purchases or payments were made on the Jared's account, but fees and interest accrued. The total amount owed on the Jared's account was $2,364.24.

The trial court ordered that Christina be responsible for $1,614.24 of the Jared's debt, which was calculated based on the total owed ($2,364.24) minus the reasonable amount of one necklace ($750). The trial court found that it was "arguable that Jonah as a husband still wanted his wife to have the jewelry she wanted." Decision (Mar. 21, 2025), p. 15.

{¶ 112} On September 12, 2021, Jonah took out a loan for $5,145.35 from Fetch to purchase a dog for Christina's children. Jonah financed the purchase of the dog, but no payments were made. When Jonah left Christina's home in January 2022, Christina kept the dog. According to Christina, the day after Jonah left the marital home, the dog died. Jonah was sued in Fairborn Municipal Court for the full principal amount plus late charges and interest for the Fetch account. To resolve the lawsuit, Jonah borrowed $4,000 from his parents. Jonah signed a promissory note for $4,000 to reimburse his parents, a copy of which was submitted at trial.

{¶ 113} At the time Jonah made purchases on each of the accounts, he was neither working nor had access to any money. Despite Christina's complete control of the money and the parties' expectations that the monthly expenses were to be paid by Christina, Christina made no payments on any of the marital debts and allowed the debts to incur late fees and interest. Meanwhile, Christina made payments on her own credit card accounts and debts during the same time frame. Significantly, the items purchased on the accounts were made at Christina's behest, for Christina's benefit, and were kept or disposed of by Christina. When Jonah left the marital home, he was unemployed, broke, homeless, and encumbered with debts due to Christina's conduct. Christina, on the other hand, kept the house, her car, Jonah's car, and all the items purchased during the marriage with no marital debts in her name.

{¶ 114} While it is true that R.C. 3105.171(C)(1) begins with a presumption of an equal division of marital property, it also provides that "[i]f an equal division of marital property would be inequitable, the court shall not divide the marital property equally but instead shall divide it between the spouses in the manner the court determines equitable." Because each divorce case is different, "equitable need not mean equal." *Koegel*, 69 Ohio St.2d at 357, citing *Cherry*, 66 Ohio St.2d 348. In view of the limited assets of the parties and Christina's blatant, rampant financial misconduct, the trial court did not act arbitrarily, unreasonably, and unconscionably in allocating the assets and liabilities of the parties. Indeed, it would have been inequitable under these circumstances for the debts to have been split equally.

{¶ 115} Christina's fifth assignment of error is overruled.

### V. Conclusion

{¶ 116} Having sustained the first assignment of error, the order of the trial court is reversed to the extent that it awarded $3,000 in attorney's fees to Jonah. The judgment of the trial court is affirmed in all other respects.

. . . . . . . . . . . .

HUFFMAN, J., and HANSEMAN, J., concur.